# CHARLESTON.

## MOORE *v.* OHIO RIVER R. CO.

Submitted June 14, 1895—Decided Nov. 20, 1895.

1. RAILWAY TICKET—CANCELLATION OF TICKET.

    Where a railroad company has adopted a rule that only one editorial pass shall issue to each paper that does its advertising, and the editor of a newspaper who has been doing such advertising, in order to pay its indebtedness to a party who has just been discharged from his employ, falsely represents to such railroad company that said party is on his editorial staff, and thus induces the said company to issue a 1,000-mile ticket in favor of such party, if the party to whom it is so issued has notice of the fraud by which said ticket was obtained, the ticket would be invalid, and on discovering such fraud the company has the right to take up and cancel the ticket.

2. RAILWAY TICKET—EJECTION OF PASSENGER.

    Where the party holding such ticket, after having used it in traveling several hundred miles, is warned by the conductor that the ticket is not good, and that he has been ordered to take it up, but does not then do so, and said party pays his fare on several trips, the conductor advising him to go to the railroad office and inquire about the ticket, and said party, neglecting to make any inquiry, although he has several opportunities of so doing, again boards the train with the purpose of becoming a passenger, and offers said mileage ticket in payment of his fare, the conductor, upon the refusal of the party to pay his fare, may take up said ticket and eject him from the car, using no more force than is necessary for that purpose.

V. B. ARCHER for plaintiff in error:

I.—*Passenger defined.*—96 Pa. St. 267; 2 Am. & Eng. Ency. Law, 743.

II.—*Liability to passenger dependent on contract.*—7 Am. & Eng. Ency. Law, 742; 18 Am. & Eng. R. Cas. 170.

III.—*A railroad ticket is not a negotiable instrument.*—42 Ohio St. 560.

IV.—*Exemplary damages in proper cases may be awarded in West Virginia for eviction of passenger from train.*— 34 W. Va. 65; 36 W. Va. 318; 39 W. Va. 477; 40 W. Va. 271.

V.—*Whether the case is one for compensatory or for exemplary damages, is for the court and not the jury.*—34 Pa. St. 48; 119 Pa. St. 44, 45; 104 Pa. St. 306.

VI.—*Damages for injured feelings can only be awarded when physical pain is suffered.*—90 Am. Dec. 332; 1 Pa. St. 190; 10 Pa. St. 145.

VII.—*Person who voluntarily submits to an assault can only recover compensatory damages.*—20 Am. Rep. 328; 48 Am. Rep. 538; 2 Greenl. Ev. § 85; Exodus, chap. 21, verses 18 and 19.

VIII.—*Damages for mental suffering not allowed apart from physical injury as a distinct element of damages.*—131 U. S. 26.

IX.—*The rule as to compensatory and exemplary damages in federal courts.*—147 U. S. 107.

X.—*Passenger can not increase his damages by refusal to leave car when ordered so to do.*—34 Am. & Eng. R. Cas. 320; 15 Fed. Rep. 57; 86 N. Y. 301; 16 Am. & Eng. R. Cas. 386; 112 Ill. 296; 75 Ill. 125; 3 Wood Ry. Law, § 364.

XI.—*In what cases and under what circumstances exemplary damages should be awarded, in West Va.*—35 W. Va. 588; 36 W. Va. 318; 39 W. Va. 477; 40 W. Va. 271; Id. 246.

XII.—*The rule as to exemplary damages in other courts applied to case at bar.*—1 Am. St. Rep. 608; 37 Am. & Eng. R. Cas. 166; 49 Ill. 241; 74 Am. Dec. 259; 50 Am. Dec. (note) 767; 18 Am. & Eng. R. Cas. 347; 9 Am. St. Rep. 769, note 777-8; 2 Am. Rep. 39; 34 Am. & Eng. R. Cases, 311.

XIII.—*Exemplary damages not allowed in absence of fraud, malice, or oppression.*—46 Kan. 109, 581; 7 Am. & Eng. Ency. Law, 21, 22 and notes; 45 Minn. 53; 44 Minn.

454; 94 N. C. 318; 102 N. C. 59; 28 W. Va. 732; 33 W. Va. 433.

XIV.— *Where statute gives exemplary damages.*—40 W. Va. 246; 44 Fed. Rep. 248.

XV.—*Distinction between exemplary and compensatory damages.*—123 Pa. St. 140; 23 Pa. St. 523.

XVI.—*Comparison with Virginia cases.*—82 Va. 250; 17 S. E. Rep. 757.

XVII.— *When an unlawful act may be made the basis for exemplary damages.*—76 Va. 128; 21 How. 202; 116 U. S. 550; 122 U. S. 597; 147 U. S. 101; 12 S. E. Rep. 139; 11 S. E. Rep. 526.

XVIII.—*Persons evicted can not increase damages by failing to take the necessary means to reach destination.*—47 Am. & Eng. R. Cas. 135.

XIX.—*Rule in North Carolina as to exemplary damages.*—11 S. E. Rep. 526.

XX.—*Rule as to exemplary damages applies to corporations same as to individuals.*—147 U. S. 109.

XXI.—*Cases in West Virginia where right to exemplary damages denied.*—28 W. Va. 732; 33 W. Va. 433.

XXII.—*In suits on contract damages never exemplary.*—5 Am. & Eng. Ency. Law, 21 note 2.

XXIII.—*An act although wrongful not necessarily one which justifies awarding punitive or exemplary damages.*—53 N. Y. 25; 56 N. Y. 295.

XXIV.—*The mere fact that the act was wrongful will not justify exemplary damages.*—47 N. E. Rep. 312; 62 Am. Dec. 384; 47 Am. & Eng. R. Cas. 622.

XXV.— *Where the defendant has a reasonable foundation for his action, upon which he bases his act, which results in the injury, exemplary damages will not be awarded.*—23 Pa. St. 523; 7 Car. & P. 621, 369 and *n*; 10 Ad. & Ellis, 117; 13 Pick. 503; 1 Johns. Cas. 116; 7 Cow. 22; 7 Wend. 142, 560.

XXVI.—*Cases in West Virginia where exemplary damages have been refused.*—28 W. Va. 732; 33 W. Va. 433.

XXVII.—*Railroad companies may make reasonable rules for the government and regulation of their business.*—26 Am.

& Eng R. Cas. 234; 18 Id. 316, 347; 9 Id. 345; 6 Id.
583; 2 Id. 280; 2 Wood's Railway Law, § 352.

MILLER & WHITE for defendant in error, cited 1 Bart.
Law Pr. 393; 34 W. Va. 67, 68, 72; 5 W. Va. 10; Ray, Neg.
Imposed Duties, 4, 19; 35 W. Va. 588; 2 Wood, R. Law of Ry.
§§ 853, 868; 35 W. Va. 220; 36 W. Va. 328; 2 Wood, Law
of Ry. 1394; 2 Beech, Law of Ry. §§ 869, 870; Lawson
Cont. Car. § 106; 4 Am. St. Rep. 539; 72 Am. Dec. 469; 45
Id. 190; 88 Id. 199; Ray, Neg. Imposed Duties, § 61; Law-
son's Cont. Car. 455; 2 Wood, Law of Ry. § 352; Bish.
Cont. §§ 648, 679; 35 Minn. 203; 28 Am. St. Rep. 858; 8
Am & Eng. Enc. Law, 626-27; 35 Md. 439, 452; 18 Am. St.
Rep. 555; 49 Am. Rep. 25; 116 U. S. 599; 13 Gratt. 432,
436; 6 Id. 268; 4 U. S. App. 259; 49 Fed Rep. 801; 6 U. S.
App. 307; 127 U. S. 390; 132 U. S. 146; 50 Am. Rep. 310;
113 U. S. 50; 2 Pars. Cont. 812, 815; 20 N. E. Rep. 89; 12 S.
E. Rep. 1063; 3 Southerland, Dam. §§ 95, 942; Wood, Mayne
Dam. 50; 14 S. E. Rep. 950; 11 Gratt. 722; 36 W. Va. 324.

ENGLISH, JUDGE:

This was an action of trespass on the case brought in the
Circuit Court of Wood county against the Ohio River
Railroad Company by A. B. Moore, who claims: That on
the 29th day of October, 1891, he became a passenger up-
on one of the passenger trains of the defendant at the city
of Parkersburg, to be carried thereby from said city of
Parkersburg to the town of New Martinsville, and that he
offered to pay his fare on said train by tendering to the
conductor of said train a certain 1,000-mile ticket, or book
of mileage coupons, No. B39, which he purchased on the
2d day of January, 1891, from the said defendant, for a val-
uable consideration, which ticket entitled him to travel
1,000 miles on the railway of the defendant between the
31st day of December, 1890, and the 31st day of Decem-
ber, 1891, which ticket entitled him to travel between the
said city of Parkersburg and the said town of New Mar-
tinsville, as aforesaid, on the 29th day of October, 1891,
and at all times until the expiration of said ticket. That
it was the duty of the conductor of said train to receive and

detach a sufficient number of mileage coupons therefrom to have paid the plaintiff's fare for his passage, of which coupons there remained in said book a much larger number than was necessary to have paid the said fare, yet the said conductor refused to receive said ticket, or detach said coupons for his fare, but took up said 1,000 mile ticket, and demanded of the plaintiff that he should pay other and different fare, or be ejected from the said defendant's passenger car and train in which he was traveling as a passenger; and the plaintiff declining and refusing to leave said train, and insisting on his right to remain therein and to pay his fare with said 1,000-mile ticket, the said defendant, by and through the conductor of said train, unlawfully and forcibly seized the plaintiff, and forcibly ejected and excluded the plaintiff, and with great force, and against the will and protest of the plaintiff, ejected him from said passenger car upon the ground, near the station of Waverly, in said county of Wood, and did not, as it was legally and in duty bound, carry the plaintiff from the city of Parkersbugh to the town of New Martinsville aforesaid, by means whereof he was exposed to the weather, and, being without money, was compelled to walk a great distance, to wit, from the station of Waverly to the town of New Martinsville, and was made sore and lame in his body and limbs, and did not reach his home, in the town of New Martinsville, until noon on the 31st day of October, 1891, and was greatly exposed to hunger, and he was greatly humiliated in his feelings and hurt in his pride, by being exposed to other passengers on the cars, and was prevented from reaching his business as he was obliged to do on the 29th of October, 1891, and as he would have done but for the grievances aforesaid; and being a publisher of a weekly newspaper in the town of New Martinsville, to wit, the Wetzel Republican, which is published on Thursday of each week, he was prevented on the 29th of October, 1891, being Thursday, by means of the grievances of the defendant aforesaid, from reaching his place of business, and from printing, issuing, publishing, and forwarding to his subscribers his said newspaper for that week; and divers reports were thereby caused to be circulated of and concern-

ing the plaintiff's said newspaper, "that it was dead," and thereby he was greatly vexed and harassed, and sustained great damages in his said business and publishing said newspaper, and in his business reputation and credit, and sustained many other damages and injuries, to the damage of said plaintiff ten thousand dollars.

The defendant demurred to the plaintiff's declaration filed in the case, which demurrer was overruled by the court. The defendant pleaded not guilty, and issue was thereon joined. On the 23d day of February the case was submitted to a jury, which failed to agree, and was discharged. On the 28th day of November, 1893, the case was again submitted to a jury, which on the 2d day of December, 1893, resulted in a verdict for the plaintiff of seven hundred and fifty dollars. The defendant moved the court to set aside the verdict, and award a new trial: First, because the verdict was contrary to the law and the evidence; second, because the court refused and modified certain of defendant's written instructions to the jury; third, because the court instructed the jury as prayed for on behalf of the plaintiff, against the objections of defendant; fourth, because said verdict was excessive—which motion was overruled, and judgment rendered. The defendant excepted, and applied for and obtained this writ of error.

The first error assigned is as to the action of the court in overruling the demurrer, but as nothing is urged in the argument against the sufficiency of the declaration, and the declaration appears to be well enough, it is presumed that the defendant did not rely upon its demurrer.

The second assignment of error relied upon is as to the action of the court in overruling defendant's motion for a new trial. This assignment involves a discussion of the case as presented by the evidence, and at the threshold we may inquire how, and under what circumstances, the plaintiff came into possession of the 1,000-mile ticket on which he was seeking to travel at the time he was ejected from the cars at Waverly, in Wood county. The plaintiff, A. B. Moore, in his testimony, states that after he had ceased to work for Mr. Dudley, on the Huntington Times, and was settling up, said Dudley was hard pushed for money; that

he only gave him a little money along at a time, and at the time he quit he owed him something over thirty dollars, and he had not enough money to pay it, and, through another man working in the office, he asked him if he would not take a 1,000-mile book; that he finally agreed to take a 1,000-mile book on the Ohio River Railroad; that on the last day of December, or first day of January, said Dudley tendered him this book; he took it and looked at, but declined to take it because it had Dudley's name on it, and Dudley replied that did not make any difference, as they did not know him on the road, and witness could take it and ride on it; that he accepted it when he had it changed; that the ticket first offered him was made out to Dudley; that he accepted the book after he had had it changed; that he took it at twelve dollars, the book contained 1,000 miles of coupons when he received it; that after receiving the book he worked no more for the Times, but was employed for a time on the Herald, in Huntington; that he had used seven hundred and ninety six miles of the ticket at the time it was taken up, leaving two hundred and four miles still unused, so that the amount used, at 2 cents a mile, would amount to fifteen dollars and ninety two cents. The plaintiff in his testimony states that James R. Dudley had the Ohio River Railroad Company to change the ticket from his name to that of plaintiff, and, although plaintiff had no connection with the Times from and after the 1st day of January, 1891, yet he allowed the railroad company to remain in ignorance of the fact until the 26th of September 1891, when he wrote the following letter to George W. Thompson, president of said company:

"The Daily Times. Jas. R. Dudley, Proprietor. Huntington, W. Va., Sept. 26, 1891. Mr. Geo. W. Thompson—Dear Sir: I would kindly request you to take up the pass book now issued to A. B. Moore on account Daily Times, as he is no longer in my employ, and, instead, please issue a new pass book on account of my paper, in the name of R. M. Clouston. Hoping to have an early reply to this, I am, very truly yours, James R. Dudley.

"P. S. I am pretty sure the pass issued to Mr. Moore has been consumed, but I can not see him to get the stub. J. R. D."

This letter shows pretty clearly that said book was issued to A. B. Moore upon the representation of said Dudley that said Moore was an employe of the Times. He requests it to be taken up, "as he is no longer in my employ." This letter was written on the 26th day of September, and on the 6th day of October, following, the following order was issued to conductors:

"If editorial ticket No. 39, favor of A. B. Moore, is presented for passage, you will please take the same up, returning it to this office. W. J. Robinson, Gen. Pass. Agent. A. J. Bandy, Asst. Gen. Pass. Agent."

But, if more convincing proof was required that such representations were made to the said railroad company at the time he obtained said pass book for the plaintiff, it is found in the letter dated December 29, 1890, found on page 88 of the record; which reads as follows:

" Huntington, West Va., Dec. 29th, 1890. Mr. Geo. W. Thompson—Dear Sir: I am in receipt of pass book for 1891 over your road, for which I extend thanks. I would respectfully ask that you issue a permit for A. B. Moore to use my pass book, he being on the Times staff, and my close attention to office business prevents me from traveling in the interest of my paper. Hoping you will grant this favor, and attend to it by return mail, I am yours truly, James R. Dudley."

Now, when this letter is read in connection with the testimony of George Lattin, it will appear that this pass book was not obtained by a representation of the facts. The question was asked him, "Do you know what day it was that he (meaning A. B. Moore) quit working for Mr. Dudley ?" and replied, "About the 1st of January, 1891." Again he was asked, "Do you know under what circumstances he quit working for Mr. Dudley ?" and replied, "Mr. Dudley wrote a note asking him to resign, or telling him his resignation would be accepted at a certain time—about the 1st of January," that said Moore was working as a compositor, and when asked if he did resign, replied, " Yes, sir; he agreed to quit then;" and in reply to the question, " What date was fixed that the resignation should take effect?" answered, 'About January 1st." And said plaintiff states in his own

testimony that after quitting work on the Huntington
Times, and receiving said mileage book, he did not work
for Mr. Dudley subsequent to that time.   According to his
own testimony, he never traveled a mile, either before or
after the 1st day of January, 1891, in the interest of said
Dudley's newspaper.  From the time he commenced, in
November, 1890, until he quit, on the 1st day of January,
1891, he was working as a compositor in the office, and af-
ter that time he did not work for him in any capacity.  At
the time the pass book was taken up, he had used nearly
sixteen dollars worth of coupons at the reduced rate of two
cents per mile, and, at the regular rates, it would have
amounted to nearly twenty five dollars; and every mile he
rode on the train he was aware that he was assisting said
Dudley in perpetrating a fraud upon the company, for he
knew that said Dudley had procured his (Moore's) name
to be inserted in said pass book by false representations,
and every time he looked at the face of the pass he could
read: "Editor's pass.  Pass A. B. Moore between Wheel-
ing and Huntington on account Daily Times."  He, how-
ever, had obtained a pass worth twenty dollars for twelve
dollars, and although he had used it to the extent of nearly
sixteen dollars, at the rate of two cents per mile, he wished,
by means of the fraud, to obtain from the railroad com-
pany the remaining four dollars, and would have done so
but for the letter of said Dudley, addressed to the presi-
dent of the company, requesting him, on the 26th day of
September, 1891, to take up said pass book, and informing
him that A. B. Moore was no longer in his employ, which
information he could have given as well on the 1st day of
January, 1891, for the testimony of plaintiff himself shows
that he went to work on the Huntington Herald after he
resigned his place on the Times, and that after he quit the
employ of the Herald he went to New Martinsville, where
he had remained ever since.

Did the plaintiff have notice that the 1000-mile ticket he
held would not be received for fare, before he was ejected
from the train ?  Looking again to his own testimony, on
page 27 of the record, he says: "A few days before (mean-
ing before the mileage book was taken up) I was coming

down the river to Sistersville. That was before this. I was coming down on the train from New Martinsville to Sistersville—nine miles. I handed it to Mr Hendershot, and he says, 'I believe I was ordered to take this up,' and I asked him from whom the order came, and he said from the company, or from the head of the department, or words to that effect. I says, 'That must be a mistake.' Well, he did not know; he did not have the order with him; and he came back to me then again, and says, 'I will not take this book up now, but I will see about it.' I told him then I would be going up on the next train. * * * I came on the train the next morning to Sistersville, and asked him if he had seen about the book, and he said, 'No.' I said, 'Then I will just pay you my fare, because the book belongs to me, and I will see if I can learn what is the matter;' and he said perhaps that would be the best way. That was on Wednesday, and on Saturday evening of the same week I went down the river; came here (meaning to Parkersburg); was going to Cincinnati on business on his train; and again bought a ticket. Did not think about using the book then. Thought I would see some of the officials of the road here on Saturday evening. I had no opportunity to see any of them, and left on Sunday for Cincinnati (there was no business done on Sunday). Returned on Wednesday evening, arriving late in the evening; before dark, however, but too late to go up on the Ohio River road home. In the evening a gentleman went with me down to the railroad office after the train had left, and we went to some of the rooms of some of the officials there, but nobody was about." The next morning he left on the 6:45 train over the Ohio River Railroad, and offered this book to Mr. Hendershot (the same conductor) to pay his fare, and he took it up, and demanded payment of the fare. So that, upon the plaintiff's own showing, he had had notice for more than a week that this conductor could not receive the book for fare. The conductor advised him to see about it, and did not take up the book at first. But the plaintiff paid his fare on three occasions, and had ample time and opportunity to go to the officials and learn what was wrong about the book; being in Parkersburg on two occasions,

staying all night both times, after he had been warned that the company would not recognize the pass, without seeing any person that could give him information in reference to the matter. And he seeks again, on Thursday morning, to pay his fare with this book, and the conductor then took it up, under orders of the company, and demanded fare, which he declined to pay; and the conductor, after requesting him to leave the car on two occasions, evicted him from the train, under the rules of the railroad, as the evidence shows, using only such force as was necessary to remove him from the cars. And, unless this rule is to be enforced, I see nothing to prevent any person who chooses to take a seat in the cars from riding where he chooses, without payment of fare. In this instance, before putting plaintiff off, the conductor asked him if he did not have something to put up for the fare—to be good for it—and he said he had not. He also asked him if he would be good to him for it if he would pay the fare for him. "No," he said, he would not do it; and he told him then he would have to let him off. And he put him off, without inflicting upon him, so far as the evidence discloses, any physical injury.

This mileage book was issued to the plaintiff at the request of James R. Dudley, editor of the Huntington Times, upon the representation of said Dudley that plaintiff was in his employ, which representation was not in accordance with the facts, and when we consider the additional fact that said Dudley on the 26th day of September requested the president of the company to take up the pass book issued to said A. B. Moore, assigning as a reason for the request that he was no longer in his employ, and the further fact that on the 6th day of October, 1891, in pursuance of said request, the general passenger agent of the company issued an order to the conductors of said road, directing that if editorial book No. 39, favor of A. B. Moore, was presented for passage, they would please take the same up, returning it to the office. Mr. Hendershot, the conductor, says: "This order was put up on the bulletin board. It was fastened up where we all could see it, and we all take a copy." This mileage book, it must be remembered, was issued to the plaintiff, A. B. Moore, on the written request

of said Dudley; he representing that the plaintiff was on the Times staff, and his close attention to business prevented him from traveling in the interest of his paper. And it was ordered to be taken up on the written request of the same party, representing that he was no longer in his employ. This company was under no obligations to Moore, but it was to Dudley, and both of his requests were complied with; and the plaintiff, Moore, has no reason to complain of the action of the company, as it was dealing with Dudley, and not with plaintiff. It was Dudley who paid the consideration for the book, and under his directions the name of Moore was inserted, so that he could use it, as he stated, as an employe of the Times. So, when such employment ceased (which in fact ceased before the book issued) the company, on being informed of the fact, would regard the request to take it up as nothing more than reasonable. So that the plaintiff has more reason to complain of Dudley than he has of the company. Now, let us look again at the conduct of the conductor, and inquire in what respect he is to blame. On the 6th day of October he sees this order on the bulletin board, to take up this book 39. He takes a copy of it. And when plaintiff boarded the train at New Martinsville, coming down to Sistersville, he handed this book to Hendershot, the conductor, in payment, and the conductor says: "I told him I had an order to take that book up, and plaintiff said: 'I do not know. There must be some mistake about this.' And he said something about his brother having a book; that he knew there was two of them, and two books out." And he told him that he would not accept the mileage, and handed the book back. He told him there was something wrong about the book, and that he had better send it in, to see something about it. He paid his fare to Sistersville, and the next morning returned to New Martinsville, and paid his fare again. Plaintiff came down on the train again on Saturday, and again paid his fare. So that he had ample notice before the 29th of October that the book would not be received as fare by this conductor, and although he was advised by the conductor to go to the company's office and inquire into the matter, and had am-

ple opportunity to do so (being in Parkersburgh on two occasions, staying all night each time) yet he failed to see any of the officers of the company, but boarded the train on the 29th of October, and again offered this book for his fare, and, when the conductor offered to pay his fare for him if he would agree to reimburse him, positively refused to do so; and there was nothing left for the conductor to do but to put him off, as required by the rules of the train, and this he did without injury, only using such force as was necessary to remove him from the car.

In the case of *McKay* v. *Railway Co.*, 34 W. Va. 65 (11 S. E. 737) this Court held that "a railroad conductor may demand a ticket as evidence of a passenger's right of passage, or on failure of the passenger to produce it, may demand payment of fare, and, on failure to pay it, may lawfully eject the passenger from the train, using no more force than necessary." It is true that in this instance the plaintiff offered the conductor a ticket in the shape of a mileage book for his fare, but more than a week before that time he had full notice that said book would not be received, and the same conductor had advised him to go to the office and see about it. The conductor had his orders from headquarters to take up this book, and the plaintiff knew it. He further knew that the book had been originally obtained by false representations, or at least his name was inserted on such representations, but he had used it for months without such facts being known to the company, and when it was made known the book had been ordered to be taken up. If he did not know this fact, he had sufficient notice to put him on inquiry; and, if he failed to ascertain the facts he could blame no one but himself. But the plaintiff evidently knew that the company would not have issued this pass book to him, the same being an editor's pass, but for the fact that Dudley falsely represented that he belonged to his editorial staff. And the contract, as between Dudley and the company, being vitiated by reason of the fraudulent representations, would not be binding upon the company.

During the trial of the cause the court gave to the jury the following instructions on motion of the plaintiff, which

were objected to by the defendant, which objections were overruled by the court, and an exception taken:

"Instructions for plaintiff:

"(1) The jury is instructed that if they believe from the evidence in this case that the defendant, Ohio River Railroad Company, issued to the plaintiff, A. B. Moore, the 1,000-mile ticket book, B. No. 39, offered in evidence, to be good over its railroads for the year 1891, between Huntington, W. Va. and Wheeling, W. Va. for a valuable consideration paid by said Moore, and that he accepted the same in good faith, and that said Moore accepted said mileage or ticket book by subscribing his name to the agreement contained therein, before said book was recalled or canceled by the defendant, and if the jury further believe that while the plaintiff was riding on the defendant's passenger cars on its said road between the points of Huntington and Wheeling, W. Va , to wit, from Parkersburgh, W. Va. to New Martinsville, W. Va., on the 29th day of October, 1891, the said mileage ticket book was taken from the plaintiff by defendant's conductor while riding on said passenger car, and when offered to the conductor to take out plaintiff's fare to New Martinsville, W. Va., which place is between Huntington and Wheeling, W. Va., and if the jury further believe that said plaintiff had not violated any of the provisions of the agreement contained in said book and subscribed to by him, and that the said conductor did then and there keep the said mileage or ticket book, and did then and there, to wit, at Waverly, Wood county, W. Va., forcibly eject the plaintiff from the said passenger car, thirty six miles from his destination, then the jury are instructed that the plaintiff has a right to recover such damages as the jury may believe will compensate him for the injury, the assault made upon him, the indignity and humiliation of being publicly ejected from the said passenger car.

"(2) The jury are instructed that if they believe from the evidence that in December, 1890, the Ohio River Railroad Company made a contract with James R. Dudley, editor of the Huntington Daily Times, to publish the time card of said company for the year 1890, and such other notices

as the said company may want, and in payment thereof did deliver to the said Dudley a 1,000-mile ticket book over said road, and that said Dudley did return said 1,000-mile ticket book to the said company, with a request to issue a mileage ticket book to the plaintive, A. B. Moore, in lieu of the one so returned, and that said company did issue said book, B No. 39, for said Moore, and that he accepted the same in good faith and for a valuable consideration, and the jury further believe that said J. R. Dudley complied with said contract by publishing the said time card of said O. R. R. Co. during the year 1891, and any other notices that said company did require, then the said defendant could not cancel or annul said ticket book No. 39, issued to said Moore, without the consent of said Moore, and the arbitrary taking of said book from the plaintiff Moore by defendant's conductor was unlawful, and the ejecting of plaintiff from defendant's train, after depriving him of his said ticket book, was unlawful, and against the rights of plaintiff, and he is entitled to recover in this action.

"(3) If the jury believe from the evidence that the Ohio River Railroad Company and J. R. Dudley, editor of the Huntington Times, in December, 1890, made a contract by which Dudley was to publish the time card and other notices of said railroad company for the year 1891, and was to receive for said services and work a 1,000-mileage ticket or book on said road, and if the jury believe that said publishing was done according to said contract, and that on January 2, 1891, the said company, at the request of Dudley, issued a book to A. B. Moore, the plaintiff, who accepted the same in good faith and for a valuble consideration, then any act or agreement by and between Dudley and the said company in the absence of the said Moore, and without his consent in regard to said ticket, could not affect the rights of said Moore, nor cancel or annul the said ticket."

The court, also, at the instance of the said defendant, gave several instructions as they were asked by said defendant, but modified several of said instructions, to which modifications the defendant excepted, which instructions so modified appear in bills of exception 5, 6, 11, 12, and 15, which read as follows:

" 'No. 2. The jury are further instructed that the possession of a railroad ticket is not conclusive evidence of the right of the holder to transportation; that the circumstances may be such that it will be a proper subject of investigation whether the holder of the ticket has not got possession of it by fraud, and the jury are therefore further instructed that if they believe from the evidence in this case that the ticket B39 was obtained by J. R. Dudley, editor of the Daily Times, from the defendant, by the representation to the railroad company that A. B. Moore was in the employ of the said J. R. Dudley, and a member of the staff of the Daily Times, and if they further believe that this representation was false, and if they further believe that by means of such false representation the name of A. B. Moore, the plaintiff, was inserted in said ticket, that in such case the jury may consider such false representations, to find whether said ticket was fraudulently obtained by Jas. R. Dudley, and if they believe that said ticket B39, was fraudulently obtained from the defendant, then in such case the defendant had a right, upon the discovery of such fraud, to rescind the contract and take up the ticket.' To the giving of which instructions the plaintiff objected, and the court sustained said objection, and refused to give said instructions as asked for, but modified the same, and did give said instruction in words and figures as follows: 'The jury are further instructed that the possession of a railroad ticket is not conclusive evidence of the right of the holder to transportation; that it will be a proper subject for investigation whether the holder of the ticket has not got possession of it by fraud. And the jury are therefore further instructed that if they believe from the evidence in this case that the ticket B39 was obtained by J. R. Dudley, editor of the Daily Times, from the defendant, by the representation to the railroad company that A. B. Moore was in the employ of the said J. R. Dudley, and a member of the staff of the Daily Times, and that said Moore had notice thereof, and if they further believe that this representation was false, and if they further believe that by means of such false representation the name of A. B. Moore, the plaintiff, was inserted in said ticket, that in such case the jury may consid-

er such false representations, to find whether said ticket was fraudulently obtained by Jas. R. Dudley, and if they believe that said ticket, B39, was fraudulently obtained from the defendant, and that said Moore had notice thereof, then in such case the defendant had a right, upon the discovery of such fraud to rescind the contract and take up the ticket.'

"'No. 3. The jury are further instructed that if they believe from the evidence in this case that the ticket B39 was issued in consideration of the publication by J. R. Dudley, editor of the Daily Times, of the time card and local notices in the Daily Times of the defendant for the year 1891, and if they further believe from the evidence that the plaintiff, A. B. Moore, had knowledge of the said terms upon which said ticket was issued and delivered to the said J. R. Dudley, and if they further believe from the evidence that there was no other consideration paid for said ticket, and if they further believe from the evidence that said ticket was issued in the name of A. B. Moore upon the representation made by John R. Dudley, editor of the Daily Times, that the said A. B. Moore was on the staff of the Daily Times at the time said ticket was delivered to the said John R. Dudley and received by the said A. B. Moore, and if they further believe from the evidence that the representations made by the said J. R. Dudley, editor of the Daily Times, that the said A. B. Moore was on the staff of the said Daily Times, were false, and that those false representations induced the railroad company to insert the name of the said A. B. Moore in said ticket, then, in such case, upon the discovery by the defendant of such misrepresentations, said defendant had the right to cancel said ticket and take the same from the possession of the said A. B. Moore, and had the further right to demand from the said A. B. Moore the amount necessary to transport him from the city of Parkersburgh to the town of New Martinsville; and, upon a failure upon the part of the said A. B. Moore to pay the conductor the amount of fare necessary for such transportation, the conductor had the right to remove said Moore from its car, using only such force as was necessary to accomplish this purpose.' To the giving of which instruction the plaintiff objected, and the court sustained

said objection, and refused to give said instruction as asked for, but modified the same, and did give said instruction in words and figures as follows:    'The jury are further instructed that if they believe from the evidence in this case that the ticket B39 was issued in consideration of the publication by J. R. Dudley, editor of the Daily Times, of the time card and local notices in the Daily Times, of the defendant for the year 1891, and if they further believe from the evidence that the plaintiff, A. B. Moore, had knowledge of the said terms upon which said ticket was issued and delivered to the said J. R. Dudley, and if they further believe from the evidence that there was no other consideration paid for said ticket, and if they further believe from the evidence that said ticket was issued in the name of A. B. Moore upon the representation made by John R. Dudley, editor of the Daily Times, that the said A. B. Moore was on the staff of the Daily Times at the time said ticket was delivered to the said John R. Dudley and received by the said A. B. Moore, and that said Moore had notice of such representation, and if they further believe from the evidence that the representations made by the said J. R. Dudley, editor of the Daily Times, that the said A. B. Moore was on the staff of the said Daily Times, were false, and that those false representations induced the railroad company to insert the name of the said A. B. Moore in said ticket, then, in such case, upon the discovery by the defendant of such misrepresentations, said defendant had the right to cancel said ticket and take the same from the possession of the said A. B. Moore, and had the further right to demand from the said A. B. Moore the amount necessary to transport him from the city of Parkersburgh to the town of New Martinsville; and, upon a failure upon the part of the said A. B. Moore to pay the conductor the amount of fare necessary for such transportation, the conductor had the right to remove said Moore from its car, using only such force as was necessary to accomplish this purpose.'

"'No. 9. The jury are further instructed that if they believe from the evidence in this case that, before the day that the plaintiff was removed from the defendant's car by

conductor Hendershot, the said conductor notified the plaintiff that he would not receive said ticket, B39, for his fare on said railroad, and if they further believe that the said conductor notified the said plaintiff he had better send said ticket to the general office of the railroad company, or call there in person, and make inquiry as to what was wrong with said ticket, and if they further believe from the evidence that, before the said plaintiff took passage on the train of the defendant from the city of Parkersburg to the town of New Martinsville, he had an opportunity afforded him of making an investigation as to the validity of his ticket, and failed, neglected, or refused so to do, then in such case the plaintiff was guilty of negligence in not making the necessary inquiry as to the validity of said ticket, B39; and the jury should take into consideration such failure on the part of said A. B. Moore, in arriving at their verdict in this case. To which instruction the plaintiff objected, and the court sustained said objection, and refused to give said instruction as asked for, but modified the same, and gave said instruction modified as follows: 'The jury are further instructed that if they believe from the evidence in this case that, before the day that the plaintiff was removed from the defendant's car by conductor Hendershot, the said conductor notified the plaintiff that he would not receive said ticket, B39, for his fare on said railroad, and if they further believe that the said conductor notified the said plaintiff that he had better send said ticket to the general office of the railroad company, or call there in person, and make inquiry as to what was wrong with said ticket, and if they further believe from the evidence that, before the said plaintiff took passage on the train of the defendant from the city of Parkersburg to the town of New Martinsville, he had an opportunity afforded him of making an investigation as to the validity of his ticket, and failed, neglected, or refused so to to do, then in such case the jury should take into consideration such failure on the part of the said A. B. Moore, in arriving at their verdict in this case, as to what damages, if any, the plaintiff is entitled to recover.'

" 'No. 11. The jury are further instructed that if the plain-

tiff had notice that the railroad company would not receive said ticket, B39, for his fare for travel on its railroad, a sufficient length of time before he took passage on its train, the day he was removed therefrom, to have enabled him, the said plaintiff, to have investigated said ticket, and inquire into the reasons of its refusal, at the general office of said defendant, and if they further believe from the evidence that the said plaintiff failed to make such inquiries as to the validity of his ticket, then he was guilty of negligence in going upon the defendant's train without the necessary means to pay his fare as a passenger, after having notice that his ticket would not be accepted; and the jury should consider such neglect on the part of the plaintiff, in arriving at their verdict in this case.' To which instruction the plaintiff objected, and the court sustained said objection, and refused to give said instruction as asked for, but modified the same, and gave said instruction modified as follows: 'The jury are further instructed that if the plaintiff had notice that the railroad company would not receive said ticket, B39, for his fare for travel on its railroad a sufficient length of time before he took passage on its train, the day he was removed therefrom, to have enabled him, the said plaintiff, to have investigated said ticket, and inquire into the reasons of its refusal, at the general office of said defendant, and if they further believe from the evidence that the said plaintiff failed to make such inquiries as to the validity of his ticket, the jury should consider such failure on the part of the plaintiff, in arriving at their verdict in this case, in ascertaining the damages sustained by the plaintiff, if the jury find for the plaintiff.'

"'No. 13. The jury are further instructed that if they believe from the evidence in this case that Conductor Hendershot, before he removed the plaintiff from the defendant's car, offered to carry the plaintiff from Waverly to his home, in New Martinsville, if the plaintiff would agree to afterwards pay him the fare required for his transportation, and that the plaintiff refused to accept said offer of said conductor, and thereupon he was ejected by said conductor from the train, that in such case, although the jury may believe that the plaintiff was wrongfully removed from the

defendant's car, yet the plaintiff can not recover punitive or exemplary damages, but can only award compensatory damages, if any, for so being put off the train.' To which instruction the plaintiff objected, and the court sustained said objection, and refused to give said instruction, but modified the same, and gave in lieu thereof the following instruction: 'The jury are further instructed that if they believe from the evidence in this case that Conductor Hendershot, before he removed the plaintiff from the defendant's car, offered to carry the plaintiff from Waverly to his home, in New Martinsville, if the plaintiff would agree to afterwards pay him the fare required for his transportation, and that the plaintiff refused to accept said offer of said conductor, and thereupon he was ejected by said conductor from the train, that in such case, although the jury may believe that the plaintiff was wrongfully removed from the defendant's car, yet the plaintiff can not recover punitive or exemplary damages but the jury can award compensatory damages, if any, for so being put off the train, and for the injury to and assault made upon him, and the indignity and humilliating of being publicly ejected from the car.'"

The court also refused to give to the jury the following instructions asked for by the defendant:

"No. 4. The jury are further instructed that although they may believe from the evidence that, upon the face of the ticket B39, the plaintiff was entitled to travel from the city of Parkersburgh to the town of New Martinsville on the day he was put off of the defendant's train by the conductor, yet if they further believe from the evidence that said ticket was fraudulently obtained from the railroad company by J. R. Dudley, editor of the Daily Times, then the said A. B. Moore, the holder of said ticket, although he may have paid a valuable consideration for said ticket, without notice of such false representation, acquired no title to said ticket, and the defendant railroad company had a right in such case to take the ticket up and demand his fare, and, upon failure to pay such fare, to remove him from its train.

"No. 5. The jury are further instructed that if they believe from the evidence that the ticket B39 was issued by

the railroad company in consideration that J. R. Dudley, editor of the Daily Times, would publish during the year 1891 the time card and local notices for the defendant, and if they further believe from the evidence that the plaintiff, A. B. Moore, had knowledge of the terms upon which this ticket was issued, or had sufficient information to put him upon inquiry as to the terms upon which this ticket was issued, and failed to make any inquiry as to such terms before or at the time the ticket was delivered to the said plaintiff, then in such case J. R. Dudley, editor of the Daily Times, and the railroad company, had a right to rescind the contract under which said ticket was issued; and if they further believe from the evidence that the said J. R. Dudley and the railroad company did rescind the contract under which the said ticket was issued, then in such case the railroad company had a right to take said ticket from the said A. B. Moore, and require him to pay his fare before transporting him upon its trains.

"No. 6. The jury are further instructed that if they believe from the evidence in this case that ticket B39 was issued upon the representation made to the defendant by J. R. Dudley, editor of the Daily Times, that A. B. Moore was on the staff of the said Daily Times, and if they believe from the evidence that the said railroad company issued said ticket to be used by the said A. B. Moore as a member of the staff of the Daily Times, and if they further believe that afterwards they were informed by J. R. Dudley, editor of the Daily Times, that the said A. B. Moore was no longer a member of the staff of the Daily Times, and if they further believe that the said J. R. Dudley, editor of the Daily Times, requested said ticket to be taken up from the said A. B. Moore for the reason that he, the said A. B. Moore, was no longer a member of or on the staff of the Daily Times, then in such case the railroad company had the right to take said ticket, B39, from the possession of the said A. B. Moore, and require him to pay his fare on its railroad car, and, upon a failure so to do, to remove him therefrom, using the necessary force to put him off of its train.

"No. 7. The jury are further instructed that if they be-

lieve from the evidence in this case that ticket B39 was procured to be made out in the name of A. B. Moore by John R. Dudley upon the representation that the said A. B. Moore was on the staff of the said Daily Times, and if they further believe from the evidence that the only consideration which the railroad company received for the issuing of this pass was the publication by John R. Dudley, editor of the Daily Times, of its time card and local notices in the Daily Times for the year 1891, and that before the expiration of the year 1891 the said John R. Dudley notified said railroad company that he would publish its time card no longer upon the terms upon which said ticket was issued, and if they further believe from the evidence that the railroad company discovered before the end of the year that the representation so made by John R. Dudley that the said A. B. Moore was on the staff of the Daily Times was false, then in such case the railroad company had the right to rescind the original contract upon which said ticket, B39, was issued, and to take up said ticket and cancel the same, and had the right to demand the legal fare from the plaintiff before it was required to transport him from the city of Parkersburgh to the town of New Martinsville, and upon his failure to pay such fare the conductor had the right to remove said plaintiff from its car.

"No. 11. The jury are further instructed that if the plaintiff had notice that the railroad company would not receive said ticket, B39, for his fare for travel on its railroad, a sufficient length of time before he took passage on its train the day he was removed therefrom, to have enabled him, the said plaintiff, to have investigated said ticket, and inquire into the reasons of its refusal, at the general office of said defendant, and if they further believe from the evidence that the said plaintiff failed to make such inquiries as to the validity of his ticket, then he was guilty of negligence in going upon the defendant's train without the necessary means to pay his fare as a passenger, after having notice that his ticket would not be accepted; and the jury should consider such neglect on the part of the plaintiff, in arriving at their verdict in this case.

"No. 12. The jury are further instructed that the injuries

or inconvenience, if any, to the plaintiff, caused by his walk from the station at Waverly to the town of New Martinsville, would not be the proximate result of his removal from the cars, unless, after reasonable effort at the station of Waverly, he failed to find shelter or conveyance, and not then if his failure, in the opinion of the jury, was due to his negligence in not having with him money to pay for his accommodation demanded, rather than from the proximate result of his removal from the cars.

"No. 14. The jury are further instructed that although they may believe from the evidence that the plaintiff's ticket originally entitled him to his passage over the defendant's railroad from the city of Parkersburgh to the town of New Martinsville, and that such ticket was refused and that the plaintiff was expelled from the cars on his refusal to pay his fare to the conductor, that in such case the plaintiff will only be entitled to recover of the railway company the amount of the cost of a ticket from the place where he was removed from the car to his destination, New Martinsville, and also such compensatory damages as he may have sustained on account of delay and his removal, and such additional expenses as were necessarily occasioned thereby, but that the plaintiff can not recover for personal injuries received in being put off, unless the expulsion was malicious or wanton, for the reason that he might have avoided such injury by leaving the train when ordered so to do; and in such case it would be his duty to pay or leave the train, and sue for damages if he should so do."

Now, as to the instructions which were given at the instance of the plaintiff, the first of said instructions appears to lose sight of the fact that said mileage book was issued to said A. B. Moore without any consideration moving to the company from said Moore; that it was issued under a rule of said company, stated by the witness George W. Thompson, that one editorial pass book, good for 1,000 miles, should be issued to some one connected with each paper for the publication of the time card and such local notices as were desired for the space of one year. Mr. Dudley obtained this book, and must have been aware of this rule, as he made the false representation that A. B. Moore

belonged to his staff, when in fact he had dissolved his connection with the paper; and, at the time this mileage book was taken from said Moore, it was done at the request of said Dudley, who represented to the company that he was no longer in his employ. And said Moore could with much more reason complain of Dudley than he could of the company, because he had paid a consideration to Dudley for the book, and had paid nothing to the company. The instruction, however, concludes "that the plaintiff has a right to recover such damages as the jury may believe may compensate him for the injury, the assault made upon him, the indignity and humiliation of being publicly ejected from the said passenger car;" not confining them in their finding to compensatory damages, but telling them that, under the circumstances of this case, they might find vindictive or exemplary damage. This Court held in the case of *McKay* v. *Railway Co*, *supra*, that "a railroad conductor may demand a ticket as evidence of a passenger's right of passage, or, on failure of the passenger to produce it, may demand payment of fare, and, on failure to pay it, may lawfully eject the passenger from the train, using no more force than necessary." Now, the question is, how is the conductor to eject him without humiliating him? Is he to wait until the car is empty? And is he to put him off in some field or woods remote from a station or town? Surely not. He must put him off at some station, and, if he resists in the presence of the passengers, he must use such force as is necessary to eject him. And, even if this was a valid and binding contract made between the company and the plaintiff (which it was not) he could only recover compensatory damages for the breach of it. And we think that under the testimony in this case, the court was not warranted in instructing that the plaintiff had a right to recover such damages as they might believe would compensate him for "the injury, the assault made upon him, the indignity and humiliation of being publicly ejected from said passenger car." According to said Moore's own statement, the conductor went to him just before reaching Williamstown, and requested him to get off, which he declined to do; and again, just before they reach-

ed Waverly, he went to him again, and asked him if he was not going to get off, and plaintiff told him, "No;" it was not his place to get off. Then the conductor took him by the arm, and led him out of the car, and, when he held on to the railing, shoved him off. And he does not claim that he suffered any personal injury by the ejection.

The second instruction given at the instance of the plaintiff was not warranted, for the reasons above stated, and because it assumes that the evidence shows that said Moore paid a valuable consideration for said ticket to the company, and for the reason that it ignores the fact that said ticket was obtained from the company by false representation that said Moore was an employe of the Huntington Times.

The third instruction, also, was not warranted, for the reason that it omits the fact that the pass book was obtained by Dudley by false representation that said Moore was in the employ of the Times, and the company was thus induced to issue the pass to said Moore. One of its rules, which only allowed one pass to a newspaper, or to some one in its employ, was violated, and the violation was caused by the misrepresentation of said Dudley that said Moore was an employe of the Times. 2 Wood Ry. Law, p. 1411, says: "A railway company may make any reasonable regulation or condition as to the use of special tickets used by it, and they are binding upon the holder. Thus, mileage tickets issued upon condition that they shall be used within a certain time cease to be valid after the expiration of that time." So, in the case of *Lillis* v. *Railway Co.*, 64 Mo. 464, "where the holder of a 1,000 miles railroad commutation ticket, expressed to be good for six months only, after that period has elapsed, having first obtained legal advice that the ticket was good till the thousand miles were traveled, and before the ticket was exhausted, took his seat in the baggage car of a train, refused payment of fare otherwise than by offering his ticket, and was forcibly ejected from the train, held, that the ticket was void; that the holder was not a passenger, but became a trespasser on entering the baggage car, and, upon his refusal to get off, might be ejected, with the use of any force necessary to

that end, and at a point contiguous neither to a station nor dwelling house." The ticket in the case under consideration was issued at the instance of Dudley, the editor of the Times, who appears to have been familiar with the rule of the company that only one such pass would be issued to each newspaper, as in his written request for the pass he stated that the plaintiff was on his editorial staff; and, in requesting that the pass be taken up, he stated that Moore was no longer in his employ as a reason for taking it up. The transaction was with Dudley. He furnished the consideration, and the ticket was made out in favor of Moore at his (Dudley's) request. It does not appear that the officers of the company knew that Dudley owed Moore anything, or that this ticket was to be received by Moore as payment or in consideration of any indebtedness from Dudley to him; but it was issued, at the request of Dudley, to a man who was represented as an employe of the paper, to travel in its interest, because Dudley says in his letter, "My close attention to office business prevents me from traveling in the interest of my paper." The entire transaction was between the company and Dudley, and the ticket would not have been issued to said Moore, under the rules of the company, but for the false representations of said Dudley. If it was necessary that said Moore should have notice of the false and fraudulent representations made by said Dudley, we can not avoid the conclusion that he had such notice, from the fact that he had been engaged as editor of a newspaper at New Martinsville, on the line of the defendant's road, and must have known of the rule of this company with reference to editors' passes, and for the further reason that on the face of the ticket he read: "Editor's Pass. Pass A. B. Moore between Wheeling and Huntington. On account of Daily Times, is entitled to travel one thousand miles," *etc.*—when he knew he had no connection with that paper. When said Moore first saw this ticket, it had the name of Dudley in it, and he refused it until Dudley procured the name of Moore to be inserted. And when said Dudley obtained possession of said ticket, with said Moore's name inserted by means of false representations, he had no right to it, by reason of the fraud he

had practiced upon the company; and, having no right himself, he could not, by delivering it to said Moore, pay his indebtendess to Moore thereby, or confer any right to the ticket upon Moore. Pars. Cont. (8th Ed.) 520, says, "It must be remembered that no one can give what he has not himself, and therefore no one can give good title who has no good title." We can not, under the circumstances of this case, regard said Moore as a *bona fide* purchaser of this ticket, without notice of the fraud by which it was obtained; and being aware of the rule of the company, and the condition upon which the ticket was issued, he knew he was not entitled to use it.

In the circumstances disclosed by the testimony in this case, the circuit court erred, in the instructions given for the plaintiff, in directing the jury that the "plaintiff, had a right to recover such damages as they might believe would compensate him for the injury, the assault made upon him, the indignity and humiliation of being publicly ejected from the said passenger car," and in saying to the jury that the "arbitrary taking of said book from the plaintiff by defendant's conductor was unlawful, and the ejecting of plaintiff from defendant's train after depriving him of the said ticket book was unlawful, and against the rights of plaintiff, and that he was entitled to recover in said action," and in instructing said jury that "any act or agreement between Dudley and the said company in the absence of said Moore, and without his consent, could not affect the rights of said Moore, nor cancel or annul the said ticket," and the defendant's objections to said instructions should have been sustained.

So far as the modifications to the instructions asked for by the defendant suggest that said Moore was entitled to notice of the fraud practiced upon the defendant in obtaining said pass, the circumstances clearly indicate that he had such notice every time he read the pass; for he knew he had no connection with the Times, as editor or otherwise, and yet he was using an editor's pass, which read that he was entitled to travel one thousand miles on the Ohio River Railroad on account of the Daily Times. The court, in the conclusion of instruction No. 3 asked for by the defen-

dant, and as modified by it, said that if said mileage book was obtained from the company upon the false representations above stated, as to Moore's being connected with the Times, and the said A. B. Moore had knowledge of such representations, the defendant had a right to cancel said ticket, and upon his refusal to pay his fare the conductor had the right to remove him from said car, using only such force as was necessary to accomplish this purpose. Now, the question as to the effect of these representations made by Dudley was a question of law, to be deduced from all of the circumstances, and the preponderance of the testimony shows that said Moore had notice of the manner in which said ticket was obtained by said Dudley.

The court refused to give instructions 9 and 11 as asked for by the defendant, and to tell the jury that if the said A. B. Moore failed to inquire at the office in regard to the validity of said ticket after the conductor notified him that the ticket would not be received, and he had the opportunity of making such inquiry, then said Moore was guilty of negligence, but directed the jury that they might take this fact into consideration, in arriving at their verdict. We can, however, see no objection to the instruction as asked, and the court should have given the instruction as asked.

The court, in its modification of instruction No. 13 asked for by the defendant, told the jury that if they believe from the evidence in this case that "Conductor Hendershot, before he removed the plaintiff from the defendant's car, offered to carry the plaintiff from Waverly to his home, in New Martinsville, if the plaintiff would agree to afterwards pay him the fare required for his transportation, and that the plaintiff refused to accept said offer of said conductor, and thereupon he was ejected by said conductor from the train, that in such case, although the jury may believe that the plaintiff was wrongfully removed from the defendant's car, yet the plaintiff can not recover punitive or exemplary damages; but the jury can award compensatory damages, if any, for so being put off the train, and for injury to and assault made upon him, and the indignity and humiliation of being publicly ejected from the car." Now, the court in this instruction first tells the jury that, under the cir-

cumstances detailed, the plaintiff can not recover punitive or exemplary damages, but concludes the instruction by telling them that they may find damages for the assault upon him, and the indignity and humiliation of being publicly ejected, which I can but characterize as inconsistent and erroneous, and decidedly to the prejudice of the defendant; and, without discussing in detail the instructions asked for by the defendant, and refused or modified by the court, I have already said enough to indicate my views upon the questions therein raised. Now, the authorities are numerous which show that where a party is evicted from a train, he can not increase his damages by failing to take the necessary means at hand to enable him to reach his destination. In the case of *Railway Co.* v. *Birney*, 71 Ill. 391, which was a case in which a train failed to stop and take on a passenger, it was held that "where, in such a case, the passenger, instead of procuring a comfortable and safe conveyance to the place he desired to reach, or waiting a few hours for another train, went there on foot, unnecessarily, and thereby brought on sickness, he was not entitled to recover damages on account of such sickness." And in the case of *Railroad Co.* v. *Fleming*, 18 Am. & Eng. Ry. Cas. 347, it was held that "when a passenger has been removed from a railroad train wrongfully, the company would be liable for the ordinary and natural results of the the act, and therefore such as might have been reasonably expected, in view of the duty of the passenger to exercise ordinary care to so act afterwards as to prevent injury;" and this, we think, propounded the law upon this point correctly. In that case an old colored man was put off the cars at night, nine miles from his destination, for failure to pay his fare, and walked home through a snow storm, when there was a depot and thirty or forty houses near the point where he was put off, many of them occupied by persons of his own color. It was held that "the injuries caused by the walk, if any, would not be the proximate result of the removal from the cars." Now, when we look to the testimony in this case as to the treatment of the plaintiff by the conductor, we find nothing malicious, negligent, or insulting, but, on the contrary, his conduct

towards the plaintiff was marked by kindness, patience, and consideration; the conductor offering to pay the plaintiff's fare for him, if he would agree to repay him. It is true, he was led to the door, in the presence of the passengers, and put off at a station, where there were one or two persons, but there was no other alternative; and, if he was entitled to any damages, it was by reason of the company's refusing the ticket which has already been discussed. Under the circumstances, he certainly was not entitled to exemplary damages. In the case of *Holmes* v. *Railroad Co.*, 94 N. C. 318, the court held that "punitive damages are not recoverable unless there is an element of fraud, malice, gross negligence, insult, or other cause of aggravation, in the act causing the injury." In the recent case of *Mayer* v. *Frobe*, decided in this Court in March, 1895, reported in 40 W. Va. 246 (22 S. E. 58) it was held that "in actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct, or criminal indifference to civil obligations, affecting the rights of others, appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages, these terms being synonymous." There is nothing in this case, so far as the evidence discloses, to warrant such damages, or the amount of damages found by the jury, and the instructions given by the court upon this point were calculated to mislead them.

For these reasons the judgment complained of must be reversed, the verdict set aside, and the case remanded, with costs.