PER CURIAM:
This is an appeal by Marybeth Davis from an order of the Circuit Court of Greenbrier County denying her a new trial, on the basis of newly discovered evidence, on charges that she had murdered her infant daughter and had attempted to injure, by poisoning, her infant son. The appellant was sentenced to life in the penitentiary, without mercy, on the murder charge, and to from three to eighteen years in the penitentiary on the attempt to injure charge.
I.
FACTS
In November 1996, the appellant was indicated for the homicide of her infant daughter Tegan, and for attempting to injure, by poisoning, her infant son Seth. The case was subsequently tried before a jury, and during the trial, the State presented evidence indicating that at the time of Tegan’s death, her body contained lethal levels of caffeine. The State also presented circumstantial evidence suggesting that the appellant had administered the caffeine.
To support the charge that the appellant had attempted to injure her infant son Seth, by poisoning, the State introduced evidence showing that Seth was taken to a hospital suffering from an extraordinarily low level of blood sugar. Subsequent tests revealed that the child’s insulin level was extraordinarily high. The tests also suggested that the insulin was not manufactured by Seth’s body, but came from an exogenous or outside source. Further, circumstantial evidence introduced by the State suggested that the appellant, who was a nurse, had administered the insulin.
To counter the State’s evidence suggesting that she had poisoned her daughter Tegan, the appellant introduced the testimony of Dr. James R. Shipe, who had reviewed the.medical examiner’s report and the toxicology report which formed the basis of the State’s evidence. Dr. Shipe expressed the opinion that Tegan’s blood concentration of caffeine was elevated, but not extremely high, and he also stated that caffeine was not the cause of her death. He noted that the toxicology *95 report showed varying concentrations of caffeine in Tegan’s blood and tissues, suggesting that the toxicology report was inaccurate.
The appellant, to explain how her daughter Tegan died in the absence of caffeine poisoning, took the position that she had died of Reye’s Syndrome or a genetic mimic of it. She introduced expert evidence indicating that Tegan exhibited the symptoms of, and met the criteria of having, Reye’s syndrome.
At the conclusion of the trial, the jury found the defendant guilty of murdering her daughter and of attempting to injure her son by poisoning. The appellant appealed her conviction to this Court, and this Court in State v. Davis, 205 W.Va. 569, 519 S.E.2d 852 (1999), affirmed the appellant’s conviction.
After this Court affirmed the conviction, the appellant filed a number of motions with the Circuit Court of Greenbrier County requesting a new trial on the basis of new or after-discovered evidence. Ultimately, the motions were consolidated, and the trial court took them under consideration. After reviewing the evidence and the motions, the trial court denied the motions. It is from the trial court’s denial of the motions for a new trial that the appellant now appeals.
On appeal, it appears that the appellant claims that after trial, she discovered certain speetrographic evidence and tissue slides, which proved that her daughter Tegan died of Reye’s Syndrome and that caffeine poisoning was not possible. Secondly, the appellant claims that genetic tests performed after trial proved that her son Seth was» a victim of a genetic disease, rather than insulin poisoning. Lastly, the appellant claims that the State provided the jury with false information on the level of caffeine in her daughter’s body.
II.
STANDARD OF REVIEW
In the present appeal, the question is not whether the evidenced adduced at trial was sufficient to support the jury’s verdict. That question was disposed of by this Court in State v. Davis, id. Instead, in the present appeal, the question is whether the circuit court properly denied the appellant’s motions for a new trial on the basis of after-discovered evidence.
This Court has indicated that as a general proposition, it will review a circuit court’s ruling on a motion for a new trial under an abuse of discretion standard. In re State Public Building Asbestos Litigation, 193 W.Va. 119, 454 S.E.2d 413 (1994). The Court has also indicated that in reviewing such rulings, the Court will not disturb the lower court’s ruling unless the lower tribunal’s conclusions are plainly wrong or against the weight of the evidence. State v. Crouch, 191 W.Va. 272, 445 S.E.2d 213 (1994).
Additionally, in State v. Helmick, 201 W.Va. 163, 495 S.E.2d 262 (1997), the Court indicated that for a convicted defendant to prevail on a motion for a new trial based on newly-discovered evidence, the defendant has the burden of proving five.elements. Those elements are summarized in the Syllabus of State v. Frazier, 162 W.Va. 935, 253 S.E.2d 534 (1979), as follows:
A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and ■ not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence mu§t be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.
II.
DISCUSSION
As has previously been indicated, the appellant on appeal argues that after trial, she *96 discovered spectrographic results and tissue slides which showed that her daughter Tegan could not have died of caffeine poisoning as was claimed by the State during her trial. She claims that in light of the discovery of this new evidence, the circuit court should have granted her a new trial.
After the death of the appellant’s daughter, Tegan, an autopsy was performed by Dr. Anne Hooper, a physician selected by the appellant. Dr. Hooper requested that toxicology studies be performed by the State Medical Examiner’s Office, and she provided samples of Tegan’s body fluids and tissue, so that the Medical Examiner’s Office could perform the studies. The spectrographic results and tissue slides in issue in the present appeal were apparently prepared as a part of the toxicology studies. The studies resulted in a toxicology report which was examined by Dr. Hooper and various other medical experts who testified at the appellant’s trial.
After reviewing the toxicology report, as well as the results of the autopsy which she performed, Dr. Hooper concluded the appellant’s daughter Tegan had died of a caffeine overdose, and she so testified at the appellant’s .trial. It is apparent from Dr. Hooper’s testimony that her conclusion was based not only on the toxicology report, but also upon her autopsy, which showed a great number of “beads” from time-released caffeine capsules throughout Tegan’s intestinal tract. Dr. Hooper concluded that the placement of the “beads” throughout the intestinal tract indicated that the child had been fed caffeine over a period of days.
There was some inconsistency in the levels of caffeine in Tegan’s fluids and in certain tissue samples, according to the toxicology report, and these inconsistencies werev pointed out to Dr. Hooper during trial. She acknowledged that they existed, but she indicated that the caffeine levels in Tegan’s bile were lethal and that the bile had been processed through the liver suggesting lethal levels in the liver. She also remained firm in her opinion that the overall evidence showed that Tegan had died of caffeine poisoning. When pressed about how she could reach a conclusion in light of the inconsistencies in certain of the tissue samples, she testified:
Well, I formed my judgment not on any one detail. I formed my judgment on the collective — all the evidence that I had. And obviously, if I have something which doesn’t fit, I have to decide what to do with it. And I decided that in this case that the tissue levels didn’t fit, because probably they weren’t done properly, rather than those were the true values. But I have to make my decision on the basis of all the evidence I had, not just a little tiny piece of it.
The jury heard this, and copious evidence from the appellant’s experts indicating that Dr. Hooper’s conclusion was inaccurate. The jury apparently concluded that Dr. Hooper’s conclusion was accurate.
In her motion for a new trial before the circuit court, the appellant claimed, and in the present appeal, the appellant claims that only after trial did she discover the spectrographic results and tissue slides in issue. She -argues that the spectrographic results suggest that the caffeine concentration in Tegan’s flesh was lower than that found by Dr. Hooper in the child’s fluids, and that the lower concentration in the flesh suggests that Tegan did not die of caffeine poisoning. In effect, the appellant is again raising a point initially developed at trial.
During the consideration of the appellant’s motion for, a new trial, both the State and Dr. Hooper indicated that they potentially made available to the appellant the evidence in their possession. The evidence shows that the State provided the appellant with full disclosure of its investigatory findings, including nearly 3,000 pages of documents even though the appellant had not requested discovery.[1] Dr. Hooper, in an affidavit, stated that she had met with the appellant’s trial counsel on numerous occasions prior to trial and that she provided him access to anything in the case which he wanted. Specifically, Dr. Hooper stated:
*97 4. Over the years, I met with Paul Detch [the appellant’s attorney] on several occasions to discuss Tegan’s case. I cannot be specific about the dates of these meetings. I recall some meetings prior to the indictment of Marybeth Davis in 1996, but most of the meetings were after the indictment but before trial.
5. I openly discussed Tegan’s case with Mr. Detch, and readily provided any and all information that he requested.
6. Mr. Detch requested fresh tissue of Tegan Davis on more than one occasion, starting in 1995, presumably for toxicology tests. I informed him that no fresh tissue had been preserved for 13 years or longer. T. My autopsy report, as well as the report of a pediatric pathologist and" a neu-ropathologist who I consulted at West Virginia University, contained detailed information regarding microscopic findings on autopsy. Also, there was a consultation on the lddney findings with a pathologist at Emory University in Atlanta.
8. Obviously, these microscopic studies were conducted by using slides of Tegan’s tissues and other material.
9. The autopsy reports contain detailed summaries of the microscopic findings.
10. The slides have been in my possession through the years, and were in my possession during my meetings with Mr. Detch.
11. Neither Mr. Detch nor any law enforcement agent representing the state of West Virginia ever requested these slides from me, and I never provided them to anyone.
12. Everything relevant that is revealed by the slides is contained on my autopsy report and the autopsy report prepared by the pediatric pathologist at WVU.
As has previously been indicated, this Court, in State v. Helmick, stated that there were five elements relevant to whether newly-discovered evidence should form the basis of granting a new trial. One is that the person seeking the new trial must be diligent in ascertaining and securing the evidence, and the evidence must be such that due diligence would not have secured it before the verdict. Another element is that the evidence must be new and material, and not merely cumulative. Additionally, the evidence must be such as ought to produce an opposite result at a second trial.
In assessing the appellant’s motion for a new trial in the present case, the circuit court concluded that the speetrographic results were available prior to trial and that the appellant had not requested discovery and had not exercised due diligence in attempting to procure them. The court stated:
Although the defendant’s counsel now claims due diligence, the record does reflect that no records were subpoenaed, no motions for discovery were filed, and there was no request of Dr. Hooper to provide the same although there were several conferences and discussions concerning the same with her.
This Court, after reviewing the relevant portions of the record, believes that the evidence supports the trial court’s conclusion that Dr. Hooper’s records, as well as the evidence in the hands of the State, were potentially made available to the appellant prior to trial, and that the appellant, to avoid reciprocal discovery by the State, made a tactical decision not to seek formal discovery to avoid reciprocal discovery.
The speetrographic results in issue were in existence prior to trial, and were discoverable through the exercise of due diligence. These circumstances indicate that the trial court did not abuse its discretion in denying the motion for a new trial on the spectro-graphic results because the appellant had faded to use due diligence in seeking them prior to the original trial.
Additionally, the Court notes that the appellant suggests that the availability of the speetrographic records would have resulted in a different result at trial. In its brief, the State says: “The original spectrographs found in the Medical Examiner’s Office simply confirm the figures contained within the toxicology report which the Appellant had at trial. In other words, the findings reflected in the spectrographs are identical to the original toxicology report and prove nothing new.”
*98 Although this Court’s ability to interpret speetrographie graphs, figures, and charts is somewhat limited, an effort has been made to locate the toxicology report and the spectro-graphic results in issue. In this Court’s view, the figures and numbers on the spectrograph records do appear to confirm key values set forth in the toxicology report. For instance, the toxicology reports set forth a caffeine concentration in the liver of “9.04.” A spectrograph sheet labeled “Liver” has a calculation which concludes “9.04.” The toxicology report sets forth a caffeine concentration in the kidney of “11.06.” There is a spectro-graphic sheet labeled “Kidney” which concludes: “11.06.” The same correspondence exists with brain and bile values.
At best, this Court believes that the spec-trographic results would constitute cumulative evidence which would not bring about a different result upon the second trial. The values set forth in the toxicology report seem to correspond to the so-called newly-discovered speetrographie results. Clearly, the fact that there was some discrepancy with the caffeine levels in blood and tissue as reported in the toxicology report was brought to the attention of the jury during trial. Dr. Hooper plainly stated that she believed there was an error in the toxicology report but she remained steadfast in her opinion that the overall evidence showed that caffeine poisoning caused Tegan’s death. At the trial, the appellant adduced the testimony of Dr. James R. Shipe which contradicted the conclusions of Dr. Hooper. At tidal, the jury plainly had before it the discrepancies in the toxicology report, as well as plainly contradictory medical opinion as to whether caffeine caused Tegan’s death. The jury resolved the issue against the appellant.
Overall, this Court believes that the record supports the circuit court’s conclusion that the appellant did not exercise due diligence in seeking the speetrographie results prior to trial. Also, the speetrographie results were cumulative evidence of points developed during trial. The speetrographie results would have shown that the caffeine level was lower in Tegan’s tissue than in her bodily fluids, but that point was presented to the jury in the toxicology report. While the results might have added to the information providing the basis of the toxicology report, they would not have conclusively contradicted the overall evidence that Tegan died of caffeine poisoning, including the evidence that her digestive tract was filled with caffeine pellets.
In addition to claiming that the State improperly withheld the speetrographie results, the appellant claims that the State improperly withheld tissue slides. The appellant contends that the tissue slides confirm that Tegan suffered from Reye’s Syndrome or a related condition and suggests that she died from the syndrome or condition, rather than caffeine poisoning.
As has been previously stated, to counter the evidence of the State that Tegan died of caffeine poisoning, the appellant took the position during trial that Tegan actually died of Reyes Syndrome or a genetic mimic of it. The appellant’s principal witness on this was Dr. Jason Amar of Lewisburg, West Virginia. The testimony of Dr. Amar at trial proceeded as follows:
Q. Have you been asked to review the records, medical records, of both Seth Davis and Tegan Davis?
A. Yes, I have.
Q. Have you — -In regards to Tegan Davis, have you formed an opinion as to her cause of death?
A. Yes, I have.
Q. And what is your opinion?
A. Tegan Davis died of natural causes that’s a result of Reye’s Syndrome.
In addition to detailing to the jury why the progress of Tegan’s illness indicated Reye’s Syndrome or a genetic mimic of it, Dr. Amar testified that the cell studies showed that Tegan suffered from the syndrome or its mimic. For instance, he discussed the pathology report:
Q. What other observations in the pathology report are significant for Reye’s?
A. In certain areas of the brain cells, he found the central white matter displayed, what is called cytoplasmic swelling.
Q. And what is cytoplasmic swelling?
A. The cytoplasm is the — basically the liquid that is inside a cell, okay? What all *99 the items of the cell live in is a cytoplasm. Basically what this means is the cell was swollen, the brain was swollen.
Q. Is that consistent with Reye’s Syndrome?
A. Yes, it’s classic.
He also discussed Tegan’s liver tissue:
Q. And are there particular findings there in the liver biopsy that are consistent with .Reye’s Syndrome?
A. Yes, there are. The — What we just mentioned in the liver cells contain several tiny, clear, what is called ORO positive— okay, sudanophilie vacuoles, which are just holes, that do not displace the nuclei, which is the center of the cell. Okay? What this actually is measuring is fat in the cells.
Q. And what is the significance of the fat in the cells?
A. The fat in the cells, this is just classic for Reye’s Syndrome. You get either single to many little fat droplets throughout the cytoplasm of the liver without changing the architecture of the liver, and without any significant inflamation.
In the present appeal, the appellant claims that the slides which she did not have prior to trial show that Tegan had cerebral edema and fatty liver tissue changes. She has an expert, Dr. Edward R. Friedlander, Chief of Pathology at the University of Health Services in Kansas City, who would testify as follows:
A. “[Tjhere’s cerebral edema visible on ’ the slides of the brain. I didn’t even realize that Dr. Hooper had not reported the cerebral edema which I saw on the glass under the slide.”
Q. “Could you explain that?”
A. ‘Yeah, They’re little bubbles, what we call spongy change. These were visible in the sections of the brain. When I saw them, I just said, well this is cerebral edema of Reye’s Syndrome.”
And:
I saw mierovesicular fatty change in the liver ....
Q. “Could you explain the significance of that particular finding?”
A. “In a child, especially in combination with cerebral edema and a clinical picture, is very strongly suggestive of Reye’s syndrome or one of the genetic mimics of Reye’s Syndrome.”
It appears that the tissue slides in issue were in the possession of Dr. Hooper or the State Medical Examiner’s Office at the time of trial. While the tissue slides might have shown that Tegan suffered from brain swelling or edema and fatty deposits in the liver, these points were plainly and extensively developed by the appellant’s expert witnesses at trial. The slides, at best, in this Court’s view, were merely cumulative evidence of points developed and considered by the jury at trial. The Court cannot see how the evidence was such “as ought to produce an opposite result on a second trial on the merits.”
Again, with regard to the tissue slides, the Court believes that the appellant failed to establish the elements for a new trial on the basis of newly discovered evidence or that the trial court abused its discretion in denying the appellant’s motion for a new trial on that basis.
A similar claim by the appellant is that she should have been granted a new trial on the basis of new genetic testing performed upon her son Seth. The new testing, reportedly genetic testing not available at the time of trial, showed that Seth suffered from HGH deficiency, a genetic deficiency, and the appellant argues that such a deficiency could have accounted for the excess insulin which caused his injury.
As has previously been stated, the State introduced evidence indicating that Seth suffered from an extraordinary level of insulin at the time he was taken to a hospital. The* evidence also showed that he insulin had an exogenous origin, that is that it came from outside his body.
To counter the State’s evidence, the appellant introduced the testimony of an expert who suggested that HGH deficiency might have caused increased insulin production. Plainly, at trial, the jury was presented with the genetic deficiency theory of the causation of Seth’s condition and evidence suggesting *100 that he did have the condition. Specifically, an expert for the appellant, Dr. Dale M. Willis, a pediatric endocrinologist, testified at trial as follows:
Q. Doctor, do you know Seth Davis’ current length, in terms of height?
A. Yes, I am told he is — I think it’s 43 inches, or four foot three. It’s short.
Q. For 16 years of age, he is short?
A. Yes.
Q. Doctor, do you have an opinion as to whether Seth Davis has human growth hormone deficiency?
A. I would say that short stature is consistent with human growth hormone deficiency.
Q. Doctor, does human growth hormone deficiency explain the symptoms of Seth Davis reported on the charts prior to September 30th, 1981?
A. Yes, it does.
Q. Does human growth hormone deficiency explain the symptoms of Seth Davis following September 30th, 1981?
A. Yes, it does. ■
Q. Doctor, does human growth hormone deficiency explain the changes of hypoglycemia as is reported on September 30, beginning at the Greenbrier Valley Hospital, to the time he was admitted at Pittsburgh Children’s Hospital? >
A. Yes, it does.
Q. Do you have an opinion as to whether anyone injected insulin into Seth Davis on September 30th, 1981?
A. I believe no insulin was injected. That there is a likely cause of explaining both his glucoses, his growth hormone and his insulin level, without exogenous insulin ' being injected.
Although it may be argued that the genetic test allegedly proving that Seth had the condition was not available at trial, in this Court’s view, the results of the test were merely cumulative of what was presented at trial. Furthermore, the test does not conclusively prove or establish that the insulin in Seth’s body was attributable to the condition or rebut the evidence that the insulin in Seth’s body was of exogenous origin. Overall, the evidence was not such “as ought to produce a second trial on the merits,” and consequently, it cannot be said that the circuit court abused its discretion in denying a new trial on the new genetic test results.
Finally, the appellant asserts that post-trial depositions show that witnesses for the State gave false information to the jury on the level of caffeine in the appellant’s daughter’s body. The evidence about which the appellant complains was developed during the testimony of Dr. Scharman and Dr. Sopher for the State. Both doctors testified as to the levels of caffeine in the appellant’s daughter based upon the toxicology report. They formed opinions based on that report. In support of her motion for a new trial, the appellant introduced opinions of Drs. Evans and Hupka which suggested that the appellant’s daughter did not die of caffeine poisoning, and that the opinions of Drs. Scharman and Sopher were erroneous. It appears that the appellant is equating the presentation of these “erroneous opinions” with the presentation of false evidence. The essential portions of the opinions of Drs. Evans and Hupka presented after trial were essentially the same as the opinion of Dr. Shipe, a witness for the appellant at trial.
In essence, the appellant appears to be saying that experts who have reviewed the evidence after trial have concluded that the 'opinions of the State’s experts were inaccurate, and, thus, the State’s experts gave false testimony at trial.
In this Court’s view, professional opinions given by competent experts, even if contradicted by opinions of other competent experts, cannot be said to be inherently false. Opinion is opinion, and the Court believes that only if it is shown that an expert’s testimonial opinion is diametrically opposite to the opinion which he actually and truthfully holds at the time can the expert’s opinion be said to be false. That has not been shown in this case, and, consequently, the Court does not believe that the trial court abused its discretion in refusing to grant a new trial on the alleged false testimony.
*101 For the reasons stated, the judgment of the Circuit Court of Greenbrier County is affirmed.[2]
Affirmed.

. It appears that the appellant specifically elected not to engage in formal discovery to avoid the requirement that she be subjected to reciprocal discovery under the reciprocal discovery provisions of Rui? 16 of the West Virginia Rules of Criminal Procedure.

. At the end of his brief, defendant’s counsel seemingly concedes that his "newly-discovered evidence” is cumulative of what was presented at trial, but he suggests that it would have had more persuasive impact. He says: “What the defense lacked was the persuasive power that the new genetic tests, pictures from the tissue slides and the spectrograph now provide.” Although this Court believes, and its opinions show, that a litigant should have a fair day in Court, it has not held that a losing litigant should have endless opportunities to relitigate a case. The Court believes that this is the reason for denying a litigant a new trial on new, but cumulative, evidence. The Court also believes that all legal proceedings should be brought to an end.