IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2016 Term

_____

No. 15-0067

_____

**FILED**

**June 2, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

SAMUEL ANSTEY,
Petitioner Below, Petitioner,

v.

DAVID BALLARD,
Warden, Mt. Olive Correctional Complex,
Respondent Below, Respondent.

_____

Appeal from the Circuit Court of Fayette County
Honorable John W. Hatcher, Jr., Chief Judge
Civil Action No. 14-C-134-H

AFFIRMED

_____

Submitted: April 5, 2016
Filed: June 2, 2016

Valena E. Beety, Esq.
Wiley W. Newbold, Esq.
William L. Burner, Rule 10 Certified Law Student
Ashley M. Hawkins, Rule 10 Certified Law Student
Devon T. Unger, Rule 10 Certified Law Student
James Alexander Mead, Rule 10 Certified Law Student
West Virginia Innocence Project
West Virginia University College of Law
Clinical Law Program
Morgantown, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Derek A. Knopp, Esq
Assistant Attorney General
Gilbert C. Dickey, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE LOUGHRY delivered the Opinion of the Court.
CHIEF JUSTICE KETCHUM dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1. "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

2. "'A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his [or her] affidavit that [the defendant] was diligent in ascertaining and securing [the] evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.' Syl. pt. 1, *Halstead v. Horton*[,] 38 W.Va. 727, 18 S.E. 953 (1894)." Syllabus, *State v. Frazier*, 162 W.Va. 935, 253 S.E.2d 534 (1979).

3. "'A court having jurisdiction over habeas corpus proceedings may deny a petition for a writ of habeas corpus without a hearing and without appointing counsel for the petitioner if the petition, exhibits, affidavits or other documentary evidence filed therewith show to such court's satisfaction that the petitioner is entitled to no relief.' Syllabus Point 1, *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 657 (1973)." Syl. Pt. 2, *White v. Haines*, 215 W.Va. 698, 601 S.E.2d 18 (2004).

LOUGHRY, Justice:

This case is before us upon the appeal of Samuel Anstey ("petitioner") from the December 24, 2014, order of the Circuit Court of Fayette County denying his petition for relief in habeas corpus. The petitioner challenged his 1995 first degree murder conviction, without a recommendation of mercy, in the death of Marie Donollo ("victim"). In his habeas petition, the petitioner asserted he was entitled to a new trial because the advancement in fire science and arson investigation during the last twenty years constituted newly-discovered evidence which demonstrated the fundamental and unconstitutional unfairness of his trial. Following its consideration of the parties'[1] briefs, the affidavits of the petitioner's new fire experts, and the underlying trial record, the circuit court denied the habeas petition without holding an evidentiary hearing.[2] Based on our thorough review of the appendix record, which includes the current habeas proceeding and a transcript of the petitioner's murder trial, as well as the parties' briefs and the applicable law, we find no basis to reverse the circuit court's decision. Accordingly, we affirm.

---

[1]The named respondent in this matter is David Ballard, Warden of the Mount Olive Correctional Complex, where the petitioner is incarcerated. Inasmuch as the petitioner challenges his underlying criminal conviction in the instant proceeding, we refer to the respondent simply as "the State."

[2]The same circuit court judge who presided over the petitioner's murder trial considered the instant habeas proceeding.

1

## I. Facts

### A. The Underlying Trial

On May 11, 1994, a Fayette County grand jury returned indictment No. 94-F-31 charging the petitioner with first degree murder in violation of West Virginia Code § 61-2-1 (1991) and first degree arson in violation of West Virginia Code § 61-3-1 (1991). The State proceeded to trial solely on the murder charge under a theory of felony-murder. During the eleven-day trial, which began on August 21, 1995, twenty-nine witnesses were called by the State, and eleven witnesses testified for the defense. The petitioner did not take the stand.

The evidence revealed that sometime in either 1991 or 1992, the petitioner, a thirty-six-year-old, out-of-work coal miner, moved into the house trailer occupied by the victim, his eighty-one-year-old grandmother and adoptive mother.[3] The trailer was located in the Harvey Hill area of Fayette County. According to witnesses at trial, the relationship between the petitioner and the victim was problematic.

Witnesses for the State testified to hearing arguments between the petitioner and the victim, who was in declining health and who believed the petitioner was unwilling to help her. A neighbor, Charles Green, testified to hearing the petitioner and the victim

_____

[3]The record reveals that the petitioner's biological mother died when he was an infant; his biological father, the victim's son, was estranged from the family.

argue. He also stated that the victim asked if she could live with him and his wife so that they could take care of her.[4] On one occasion, Mr. Green observed that the victim had a black eye, which the victim attributed to the petitioner.[5] At the victim's request, Mr. Green installed brackets on the victim's bedroom door, so that she could put a padlock on it. He "reckon[ed]" the victim was afraid to stay in the trailer. Another neighbor, Pamela Smith, also testified to overhearing the victim and the petitioner doing "a lot of screaming, yelling, cussing." The victim would occasionally visit Ms. Smith in her home and, during one such visit, the victim told Ms. Smith that the petitioner "used to hit her, and smack her around and choke her" and showed her the "bruises and stuff on her arms . . . and said that [the petitioner] had done it."

Nancy Kirby, who had known the victim for a number of years, testified that during the year prior to the victim's death, the victim was always upset and crying; that she complained of having no transportation and being unable to get to the store; and, that during several visits to the victim in her trailer, Ms. Kirby observed there was no food in the refrigerator. She further testified that approximately one year before the victim's death, the

---

[4]Other State's witnesses similarly testified that the victim wanted to move in with them so they could take care of her.

[5]There were no objections to either this particular evidence or to other similar evidence discussed herein; however, the trial transcript reveals the circuit court upheld defense counsel's objections to evidence of other incidents of the petitioner's physical abuse of the victim.

victim asked her to feel a knot on her head, stating the petitioner had struck her in the head with the telephone. This witness also testified that nearly every time she spoke with the victim over a four-year period, the victim told her that the petitioner treated her badly and was mean to her, and that she was taking him out of her Will.[6]

Anna Mae Sowder, a longtime friend of the victim, testified that she spoke with the victim by telephone six or seven times a week. During those conversations, the victim would talk about her "troubles," including having no way to get to the store and being alone and afraid. The victim also stated that unless the petitioner began treating her better, she would rather throw her money into the Thurmond River than allow him to have it, complaining that the petitioner "aggravate[d] [her] to death, wanting [her] money." By way of example, Ms. Sowder stated that the victim told her that after the petitioner purchased a trailer, he "aggravat[ed] her, wanting her to pay the trailer off[.]" After he purchased a truck, the victim told her that "he's expecting me to pay for the truck."[7]

---

[6]The record reveals that, in 1976, the victim executed her Last Will and Testament ("Will") naming the petitioner as her sole beneficiary.

[7]Insurance agent Edna Treadway, who had written a policy of insurance for the victim and her late husband, testified concerning the victim's complaints that neither her son (the petitioner's biological father) nor the petitioner would do anything for her; that all they wanted was her money; and that she was not going to leave either of them anything. Another longtime friend of the victim, Marlene Maynard, testified that the victim's primary complaint regarding the petitioner was that "he was always wanting money from her."

4

The State's witnesses also included various bank employees and officers who testified concerning the victim's financial activities shortly before her death. The evidence revealed that, prior to December 1993, the victim had exclusive control of her sizeable assets which largely consisted of certificates of deposit at two Oak Hill banks—Bank One and One Valley Bank.[8]

Other evidence at trial revealed that on December 9, 1993, the victim and the petitioner went to Bank One where they were assisted by longtime bank employee, Diana Janney. According to Ms. Janney, the petitioner told her that the bank needed to add him to the victim's certificate of deposit accounts. When Ms. Janney asked the victim if that was what she wanted to do, the victim "just kind of fell back in the chair a little bit and, you know, threw her hands up and said, 'Well, he's going to get it, anyway, so we might as well add him on.'" Ms. Janney explained to the victim that if the petitioner's name were added to her certificates of deposit, he would have equal rights to those funds. Ms. Janney testified: "I was kind of reluctant, so when [the petitioner] saw my reluctance, he said, well, if I didn't add the name on there, he was going to use the power of attorney to add his name on them."[9]

_____

[8]Although the victim's total assets were thought to be in excess of $700,000, following her death, the total assets were approximately at $470,000. *See infra* note 11.

[9]At that time, the petitioner did not yet have the power of attorney. According to the victim's lawyer, Phillip Tissue, the victim executed a general power of attorney ("POA") on December 15, 1993, which authorized the petitioner to act as the victim's attorney-in-fact. He explained that the victim had been hospitalized previously during which time she was

(continued...)

5

Being uncomfortable with the situation, Ms. Janney sought the assistance of her supervisor, Becky Booth.

Ms. Booth, another longtime bank employee, testified she was well acquainted with the victim who had been coming to the bank for twenty years. She assisted Ms. Janney in making certain the victim understood that anyone added to her accounts would have equal access to their funds. She also cautioned the victim that it would be far more difficult to remove someone from her accounts than it was to add them. Although Ms. Booth was also uncomfortable with the situation, being aware that the victim had never before wanted anyone else on her accounts, the bank employees proceeded to add the petitioner to the victim's certificate of deposit accounts totaling in excess of $400,000.[10] At this same time, the petitioner was also added to the victim's Bank One safety deposit box in which she kept an unknown amount of cash and certificates of deposit.

---

[9](...continued)
unable to handle her business affairs and she wanted someone authorized to act on her behalf if something like that were to happen again. The petitioner delivered a copy of the POA to Bank One.

[10]A One Valley Bank employee testified that on December 10, 1993, the victim added the petitioner to her six accounts held at that bank, which totaled approximately $68,000.

6

According to Ms. Janney, approximately one week later, the victim returned to the bank, alone, seeking to remove the petitioner from her certificate of deposit accounts. The victim was advised that the only way to remove the petitioner from her accounts was to close them, which would result in a financial penalty. Because the victim did not want to incur a penalty, no further action was taken at that time.

On February 2, 1994, the victim again visited Bank One by herself. Upon examining her safety deposit box, she became very upset because she believed some money and/or certificates of deposit were missing. Ms. Janney explained that the certificates of deposit were used to fund a trust that was established in December,[11] but the victim did not appear to understand. The victim immediately closed out her old safety deposit box, opened a new one for her exclusive use, and told Ms. Janney that she wanted to change her Will because she did not want the petitioner to have anything.

After leaving Bank One on February 2nd, the victim visited Mr. Tissue, who prepared a revocation of the POA as part of the victim's apparent effort to regain control of

---

[11]The victim's lawyer, Mr. Tissue, had calculated the victim's assets to be in excess of $700,000 based on information she had provided to him. Based on his legal advice, the victim executed a trust agreement in late December 1993, so as to reduce her estate for tax purposes. The trust provided the petitioner with $10,000 per year from the victim's Bank One accounts.

7

her assets.[12]  Describing the victim as distraught based on her belief that the petitioner had taken money from her safety deposit box, Mr. Tissue testified that the victim expressed a desire to change her Will.  An appointment was made for her to return to his office the following day at which time she reiterated her desire to change her Will.  Not knowing whom to designate as her beneficiary, they discussed the possibility of leaving her estate to charities.[13]

On February 7, 1994, the victim, this time accompanied by the petitioner, appeared at Mr. Tissue's office.  Because he was unable to see them at that time, an appointment was made for them to return on February 10, 1994.  This appointment was never kept because around 4:00 a.m. the next day, February 8, 1994, a fire occurred in the trailer shared by the petitioner and the victim.

During the ensuing investigation by law enforcement and the office of the State Fire Marshal, the petitioner maintained he awoke around 3:00 a.m. to noises and the sound

---

[12]On February 3, 1994, Bank One received a copy of this revocation.

[13]At the request of Mr. Tissue, Tim Velie, Senior Vice President of Bank One, was present at this meeting to assist in identifying options for the victim to regain control of her assets.  According to Mr. Velie, the victim did not want the petitioner to have control over her funds; she expressed a preference to throw her money into the river rather than allow the petitioner to have her money.

of the victim yelling.[14] According to the petitioner, upon opening his bedroom door, he felt intense heat, saw that the hallway was filled with smoke, and closed his door. He told the investigators that he tried to telephone for help, but alleged the home telephone was not working properly. The petitioner contended that seeing no other means of escape, he exited the trailer through his bedroom window with a few items of clothing, his shoes, his shotgun, and his keys.[15] In describing his effort to get help, the petitioner told investigators he got into his truck and drove to the homes of neighbors. He further stated that after getting no response at the first two homes, he drove back to the home of the closest neighbor, Michael Suttle, who then placed a 911 call for assistance. By way of explanation for why he did not simply run in the first instance to the Suttle home located approximately fifty-five feet from the burning trailer, the petitioner indicated because his truck had a full tank of gas, he was concerned the fire might cause the truck to explode given its proximity to the trailer.

---

[14]Sergeant John Morrison of the West Virginia State Police took a statement from the petitioner, who told him there was a POA that had been revoked; that the victim had around $700,000; that he was her sole beneficiary; that they would fight; and that she had threatened to remove him from her Will. During Sergeant Morrison's investigation, he learned that during the few weeks that the petitioner had access to the victim's safety deposit box, he opened it five times. He also spoke to Mr. Tissue who advised him that the victim's assets were in excess of $700,000, although Sergeant Morrison later learned that the figure was closer to $470,000.

[15]In exiting through the window, the petitioner sustained minor injuries. Jack Graley, an emergency medical technician who had been called to the scene, testified that the petitioner kept saying that his mom (the victim) was dead and that he would not go to the hospital unless they got his blue bag that contained important papers and a safety deposit box key.

9

The Oak Hill Volunteer Fire Department ("the VFD" or "the Department") arrived on the scene twelve minutes after receiving the fire alarm and the petitioner indicated that his grandmother was still in the trailer.[16] Firefighters discovered the unconscious victim in her bed and removed her through her bedroom window. CPR was administered, and she was transported to Plateau Medical Center in Oak Hill. The victim died on February 12, 1994. According to the State medical examiner, the cause of death was "smoke and soot inhalation resulting in a brain dead condition."

Chief Delbert Cordle of the Oak Hill VFD testified that while he did not determine the cause of the fire, he thought, based on his observations, the fire had started in the kitchen. After the fire was extinguished and the trailer secured, Chief Cordle turned the

---

[16]Firefighter Brett Rust testified that upon his arrival at the fire scene, the petitioner shined a flashlight towards the victim's bedroom and said, "My mother is in that room, but she's probably dead by now." Mr. Rust thought it was strange that the petitioner drove to houses fifty and sixty yards away when there was a house right next door. While serving as a member of the Department's fire investigation team, Mr. Rust noted that the petitioner's bedroom was virtually untouched by smoke from the fire due to weather stripping surrounding the bedroom door and a towel attached above the door.

Firefighter Samuel Jasper, Jr., testified regarding his participation in the rescue of the unconscious victim through her bedroom window. Thereafter, he assisted in suppressing the fire and, once that was accomplished, he was directed to check for hot spots. He "found a hot spot on a vent, some smoldering in the second bedroom where the lady was" that was not connected to the other fire. Based on his observations, Mr. Jasper believed the fire had started in the kitchen beside the living room area.

Firefighter Jack Holt, who assisted in fire suppression and served as a member of the Department's fire investigation team, also observed what appeared to have been a small fire in the victim's bedroom; concluded that the main fire was in the kitchen area; and noted that the toaster appeared to have heavy fire damage directly above and below it.

scene over to the Department's fire investigation unit, which was led by Lieutenant Robert Begley, and contacted the State Fire Marshal.[17]

Lieutenant Begley testified that both he and Assistant State Fire Marshal Roger York went to the fire scene during the morning of February 8th.[18] Chief Cordle and the petitioner were already at the fire scene. Lieutenant Begley spoke to the petitioner who told him they had been having a problem with an outlet in the kitchen; that he had been trying to get his mother to move; and that while she had enough money to move, she refused to do so. The petitioner also commented on how quickly the fire department had arrived.

During his investigation, Lieutenant Begley noted that the fire damage was in the living room and kitchen areas of the trailer and, principally, in the kitchen "from the counter top up." The remainder of the trailer, including the bathroom and the victim's bedroom, had heat and smoke damage but no fire damage. Lieutenant Begley did not observe any heat or smoke damage in the petitioner's bedroom, which he attributed to the towel and weather-stripping surrounding the bedroom door.[19]

---

[17]Chief Cordle contacted the State Fire Marshal because someone had been trapped in the burning trailer.

[18]Begley testified regarding his fire investigation training, which included eighty hours of course work at the National Fire Academy in Maryland.

[19]As discussed *infra*, the defense maintained the petitioner had been using the towel
(continued...)

11

Lieutenant Begley also observed "there was a lot of fire damage directly underneath the toaster" located on the kitchen counter top, noting that two sheets of aluminum foil had been placed on top of the toaster; the bottom crumb tray had been removed; and the toaster's plunger, or lever, was in the down position. Lieutenant Begley testified to seeing the charred material on the floor vent near the foot of the victim's bed, and he concluded there was no connection between that material and the fire in the kitchen area.

As part of his investigation, Lieutenant Begley photographed various areas of the fire scene, including the toaster and the electrical breaker box located in the petitioner's bedroom. Upon finding three circuit breakers that appeared to be tripped, he flipped them off, back on, and then off again. These actions were criticized by the petitioner's fire experts at trial.

The State called three fire experts at trial: Assistant State Fire Marshal Roger York; Steven Cruikshank, Director of Emergency Services and Fire Coordinator for Fayette County;[20] and Harold Franck, an expert in electrical and forensic engineering and fire determination. Each expert offered testimony concerning fire cause and origin based on their

_____

[19](...continued)
and the weather-stripping to keep noise and light from disturbing the victim.

[20]Assistant State Fire Marshal Roger York asked Mr. Cruikshank to investigate the fire and give his opinion on cause and origin.

respective examinations of the trailer and its contents. All three of these witnesses testified concerning the materials surrounding the petitioner's bedroom door, which effectively prevented smoke from entering the room; their conclusions that the area of fire origin was in the kitchen and the cause of the fire was the toaster; and their respective determinations that there had been a second, independent incendiary fire in the victim's bedroom that had self-extinguished.

Assistant State Fire Marshal York[21] described the manner in which he investigated the fire. Based on smoke patterns and other evidence, he concluded that the victim's bedroom door and window were open at the time of the fire, which allowed for smoke to travel into her room, across her bed where she was sleeping, and vent out her bedroom window. After noting the petitioner would have knowledge of air movement from his work as a coal miner, Mr. York testified that he found an anamometer in the petitioner's bedroom, which is a device used to measure airflow in an underground mine.[22] When asked

---

[21]Mr. York spoke to the petitioner, who explained his actions upon realizing the trailer was on fire. He also told Mr. York that he went to the hospital, but returned to the trailer to get his VCR, Nintendo, and clothing. When Mr. York asked the petitioner whether he was aware of any problems in the trailer, the petitioner noted a lightbulb near the kitchen stove that he thought was problematic and indicated that the furnace needed to be repaired. Both of these items were examined and eliminated as potential fire causes. The petitioner volunteered to Mr. York that the victim had revoked a power of attorney; that she had an appointment to see a lawyer on February 10th; and that he was to get everything under the victim's Will.

[22]On cross-examination, Mr. York agreed that the use of an anamometer requires a
(continued...)

13

whether the smoke detector worked, the petitioner told Mr. York that the detector did not emit sound during the fire.

Regarding the fire's origin, Mr. York testified he systematically eliminated all potential accidental causes and determined that the fire was incendiary in nature due to tampering with the toaster, which was made to appear accidental. He testified that the small fire in the victim's bedroom was not caused by the other fire, nor by the trunk-line of the furnace.[23] On cross-examination, Mr. York conceded that the material involved in the second fire could be the same type of fire debrís found in the kitchen and living room areas.[24]

Mr. Cruikshank, who had investigated approximately 200 trailer fires, testified that he began his investigation by examining the exterior of the trailer before entering and progressing from the least to heaviest areas of burn. He found major fire involvement in the kitchen with the toaster being the only potential heat source, noting heavy damage to the toaster's electrical cord. Mr. Cruikshank could find no accidental cause for either fire and

---

[22](...continued)
special training and certification and stated that he did not check to see whether the petitioner had that certification.

[23]It was also determined that the furnace thermostat was working properly and was set at seventy-five degrees.

[24]When defense counsel posed this same suggestion to Mr. Franck, he responded that while he did not do a close inspection of the material, he did not think it was ceiling tile, explaining the material would had to have been hot and burning.

14

concluded that the burning of the trailer was intentional: "[W]hen you have two separate fires and you can't connect the two, it's considered an incendiary fire."[25]

Mr. Franck, who had investigated between 400 and 500 fires,[26] eliminated all potential accidental causes for the fires, including those identified by the petitioner, i.e., a light bulb above the kitchen stove and the furnace/thermostat. He determined that the primary fire began in the kitchen near the toaster based on the degree of fire damage to this area and the "V" smoke pattern above the toaster. Mr. Franck analyzed the toaster in his lab, which revealed how it had been used to set the fire. He found that the two pieces of wire that fell out of the toaster during his examination were suspicious because they had arced on two ends, which was supportive of his conclusion that the toaster cord had been stuffed inside the bottom of the toaster.[27] Mr. Franck also observed that the spring to the toaster's control lever had been manipulated, which defeated the purpose of the lever and allowed the toaster to

[25]Mr. Cruikshank testified that he looked at, but had no concerns, regarding a living room lamp. As discussed *infra*, the petitioner's trial experts opined there was a single, accidental fire caused by a short-circuit in this lamp.

[26]Mr. Franck served as the executive secretary of the West Virginia Chapter of the International Association of Arson Investigators. He also served on that organization's international training and education committee, which caused him to be involved in teaching arson investigation to firefighters.

[27]Explaining further, Mr. Franck stated that when a wire short-circuits, it will do it at one point, and that it was "hard to believe that [the wire] will short-circuit and separate at this one point and then two inches further it will separate again, because the electricity has been cut off to it."

15

remain on.  This, in turn, caused the insulation on the cord stuffed inside the toaster to burn and catch fire.[28]  Mr. Franck found that his conclusions were further supported by a "saddle mark" on a piece of the toaster wire, which he determined was caused by the wire resting on a heating element inside the toaster.

The petitioner's trial counsel cross-examined Mr. Franck regarding National Fire Protection Association 921 ("NFPA 921").  Mr. Franck testified that he possessed all of the NFPA standards, including NFPA 921, which he described as guidelines for fire investigation.  With regard to the tripped breakers that Lieutenant Begley manipulated, Mr. Franck agreed with defense counsel that NFPA 921 states that you should not move items that are suspect in a fire.  Mr. Franck added that things are often moved around during the fire suppression effort, which is why fire investigators necessarily gather information from those involved in extinguishing the fire when making a cause and origin determination.

---

[28]Mr. Franck also examined the smoke detector, which did not activate during the fire. He determined that it was hard-wired to the trailer's electricity, rather than being battery-powered; that it was in proper working order; and that it was on an electrical circuit for which he found the breaker in the "off" position.  On cross-examination, defense counsel asked whether he was aware that the breaker had been placed in the "off" position by Lieutenant Begley.  Mr. Franck responded that he could only testify concerning what he found in the breaker box, which he considered to be consistent with all other evidence at the fire scene.

16

Turning to the petitioner's evidence, his trial strategy was to attack the quality of the State's fire investigation and the validity of the State's theory about the cause of the fire. He also attempted to rebut the State's motive evidence, i.e., the victim's intent to disinherit the petitioner. Regarding the towel and weather-stripping surrounding his bedroom door, the petitioner presented testimony of various persons who expressed their understanding that these materials had been used to subdue light and sound so as not to disturb the victim.

In addition, the petitioner presented several cause and origin witnesses,[29] who testified that there was no evidence of a fire in the victim's bedroom; that there was a single, accidental fire that originated in the living room; that the single fire was caused by a short circuit in a living room lamp; and that the fire did not start in the area where the toaster was located. During their trial testimony, each of these witnesses was handed the charred debrís that had been found in the victim's bedroom and asked to examine it, and each person testified that it looked like the burned ceiling tile remains that had been observed in the burn area of the trailer.

---

[29]Two such witnesses were Robert Hebb, Jr., and Rodney Carney, both longtime firefighters for the City of Beckley, West Virginia, and both trained in fire investigation. Mr. Hebb testified that he observed a "V" smoke pattern, which showed that the fire originated in the living and moved up and over the counter top and into the kitchen. Mr. Carney described the beading on the living room lamp cord as supportive of his conclusion that the fire was caused by the lamp short-circuiting and arcing. He also concluded that the damage in the area where the toaster had been located was not nearly as extensive as the fire damage in the living room.

17

Tim May, a professional fire investigator who had taught fire investigation at the National Fire Academy in Maryland, and who travels the world teaching fire investigation, testified as an expert for the defense. He visited the fire scene on April 13, 1995. Following his investigation, he concluded this was "an accidental fire, no question whatsoever." After explaining the "prescribed" way to conduct a cause and origin examination, he stated that his examination of the trailer revealed that the fire, "without doubt," started in the living room and not in the toaster.[30] According to Mr. May, the beading on the living room lamp's electrical cord evidenced that the wire had shorted and arced, which caused the fire. Regarding the charred debrís found in the victim's bedroom, Mr. May testified it was absolutely burned-out ceiling tile that had made its way into the victim's bedroom in the normal process of a fire scene, explaining that "if you walk through burning material, you carry it with you, and that's exactly what happened." In conclusion, Mr. May was critical of the State's fire investigators, maintaining their case made no sense and that their reports and testimony conflicted "with everything from a breaker box, to the area of origin, to the position of a toaster[.]"

The petitioner also presented the testimony of Charles Kovarik, who was qualified as an expert in electrical engineering. Like Mr. Franck, Mr. Kovarik examined the

---

[30]By the time Mr. May investigated the fire scene, which was more than a year after the fire, the toaster had already been removed from the trailer.

18

toaster. Unlike Mr. Franck, he determined that the toaster was not the source of the fire; that he was certain it was not on at the time of the fire; and that the interior of the toaster was "quite clean," whereas its exterior looked like it was the "victim" of a fire. He also found "no physical evidence that confirmed that it was rigged,"[31] and he attributed the beading on the toaster's electrical cord as being caused by the fire, rather than having caused the fire. He also disagreed with Mr. Franck's conclusions regarding "saddle marks" on the toaster cord.[32]

Like Mr. May, Mr. Kovarik agreed that the conductors shorted in the living room lamp's wiring, which created an arc that produced enough energy to create a fire.[33] He further testified that once the short circuit welded the lamp's wiring together, it would have caused the breaker to trip[34] which, in turn, would have cut off power to the smoke detector, rendering it inoperable.

---

[31]In criticizing Mr. Franck's analysis of the toaster, Mr. Kovarik stated that had he been allowed to retain the toaster for a longer period of time, he would have obtained an exemplar toaster for comparison.

[32]Expressing his unfamiliarity with the term "saddle mark," Mr. Kovarik stated he did not think those particular words were in "the dictionary of electrical terms that [] [he] kn[e]w of."

[33]When asked on cross-examination whether the short-circuit he found could have been caused by the fire, rather than causing it, Mr. Kovarik responded that "[i]t's always ambiguous when you find electrical activity that's abnormal in the area of the point of origin."

[34]Mr. Kovarik testified that he could not examine the breaker because it was no longer in the trailer at the time of his investigation.

With regard to the victim's financial activities, the defense maintained during closing argument that the evidence showed that the eighty-one-year-old victim in declining health wanted to transfer control of her money to her designated heir, the petitioner, through the creation of joint accounts and the POA. As further support for the victim's intentions, the defense stressed that she had further allowed a trust to be created for the petitioner's benefit. The defense also maintained that the victim was simply confused when she thought the petitioner had stolen some of her money from the safety deposit box because those funds had merely been forwarded to the trust account.[35]

In rebuttal, the State recalled Mr. Franck, who testified that the living room lamp did not cause the fire. He described in some detail how the shape of the beading on the lamp's cord showed that it was caused by the fire, rather than causing the fire, which he contrasted with the shape of the beading on the toaster cord, which showed that it had caused

---

[35]Part of the petitioner's trial strategy was to show that the victim was suffering from dementia in rebuttal to the testimony of the bank employees who perceived no indication of mental illness in their interactions with the victim. To that end, he presented the testimony of a neurologist who testified that his examination of the victim's brain led him to opine that she suffered from Alzheimer's disease, which can cause paranoia. He further testified that persons with breathing issues often sleep with their window open. The victim's longtime friend, Kenneth Elder, testified he was aware of the victim's breathing problems and that she slept with her bedroom window slightly open. During the State's cross-examination of Mr. Elder, he confirmed that he told an investigator that the victim said she was "scared to death" of the petitioner.

the fire. He further described the evidence showing that the lamp had not short circuited internally, but was externally attacked by the fire.

On September 8, 1995, after an eleven-day trial, the jury found the petitioner guilty of first degree murder without a recommendation of mercy. The circuit court entered an order on the verdict and sentenced the petitioner to the penitentiary for life without the possibility of parole. In December 1996, this Court refused the petitioner's direct appeal. *See State v. Samuel R. Anstey*, Docket No. 960855.[36]

## B. The Current Habeas Proceeding

On May 12, 2014, the petitioner filed a petition for a writ of habeas corpus in the Circuit Court of Fayette County challenging his murder conviction.[37] He demanded a new trial or, in the alternative, an omnibus habeas corpus hearing.[38]

---

[36]The petitioner raised nineteen issues in his direct appeal, which generally fell into the following areas: (1) insufficient evidence to support the conviction, (2) prosecutorial misconduct, (3) ineffective assistance of counsel, (4) denial of a fair trial, (5) denial of the right of confrontation, (6) judicial bias, and (7) improper sanctions.

[37]*See* W.Va. Code, §§ 53-4A-1 to -11 (2008) (West Virginia Post-Conviction Habeas Corpus Act).

[38]The petitioner has challenged his murder conviction on prior occasions through other habeas petitions. On February 6, 1998, the petitioner filed a *pro se* petition for a writ of habeas corpus in the Circuit Court of Fayette County styled *State ex rel. Anstey v. Trent*, 98-C-46 (1998). The circuit court dismissed that petition without a hearing on February 11, 1998. The petitioner appealed the dismissal to this Court, which was refused on December

(continued...)

21

The petitioner asserted in the habeas petition that the advancement of fire science and arson investigation since his 1995 conviction constitutes newly discovered evidence and demonstrates that his trial was fundamentally unfair in violation of his right to due process of law. According to the petitioner, the advancement is represented by NFPA 921. Although first published in 1992, the petitioner contends that NFPA 921 became the national authority for standards in fire investigation in 2000 upon its endorsement by the United States Department of Justice.

According to the petitioner, prior to 2000, the scientific method which forms the basis of NFPA 921 was not widely accepted and was disregarded by the State's witnesses in investigating the trailer fire. He further notes that the only mention of NFPA 921 at trial was during his counsel's cross-examination of the State's expert, Harold Franck, concerning the tripped breakers. The petitioner maintained that, even as first written, the application of

---

[38](...continued)
16, 1998. His motion to reconsider this Court's refusal was denied on January 21, 1999. The petitioner was also denied habeas relief by this Court in a separate matter. *See* Syl. Pt. 3, *State ex rel. Anstey v. Davis*, 203 W.Va. 538, 509 S.E.2d 579 (1998) ("Prison inmates have no constitutional right to possess personal computers in their cells."). Finally, in February 1999, the petitioner filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of West Virginia in which he challenged his Fayette County murder conviction. The District Court rejected the petition as untimely filed. *See Anstey v. Painter*, 2000 WL 34012352 (S.D. W.Va. Mar. 16, 2000). The petitioner's appeal from that decision was dismissed by the United States Court of Appeals for the Fourth Circuit in *Anstey v. Painter*, 20 F.App'x. 171 (4th Cir. 2001).

NFPA 921 to the investigation would have put the case in a different light and would have exposed the conclusions of the State's witnesses as being objectively unreliable.[39]

In response, the State argued that because NFPA 921 was published in 1992, well in advance of the petitioner's 1995 trial, it does not qualify as newly-discovered evidence. Arguing that NFPA 921 has never been compulsory, the State contends the provisions of NFPA 921 demonstrate that deviations from the procedures set forth therein do not automatically invalidate an expert's opinion. The State maintained that the use of NFPA 921 in a new trial would only constitute impeachment evidence and, therefore, could not serve as a basis for habeas relief. The petitioner replied that, while NFPA 921 is not compulsory, it goes beyond impeachment evidence and is of significance in the challenge to his conviction. The petitioner reasons that, at a minimum, he is entitled to an omnibus hearing to explore more thoroughly the change in science as it relates to the reliability of the evidence used to convict him.

---

[39] For example, the petitioner stated in his petition that one of the State's investigators (Lt. Begley), who noticed the toaster on the counter top with its plunger or lever in the down position, "raised the plunger until it released" and then pushed it back down. He also moved the toaster to examine it and then placed it back "in what he believed was its original position." It was only after all of these actions that Begley photographed the toaster, which led to the petitioner's assertion that "[t]he mishandling of the toaster, on which the State hinged its arson theory, is in direct contravention to the procedures that NFPA 921 requires for the preservation of evidence." In addition, the petitioner asserted the State's determination that a separate fire occurred in the victim's bedroom was conclusory and contravened NFPA 921's requirement that all data pertaining to the determination of a fire's origin be analyzed.

23

On December 24, 2014, the circuit judge, who presided over the petitioner's criminal trial, denied habeas relief. The circuit court found that an omnibus hearing was unnecessary because the petition and its attached affidavits thoroughly described the claimed advancements in scientific fire investigation, which was at the heart of the petitioner's argument, and that no testimony or other evidence was necessary for the court to rule.

In denying habeas relief, the circuit court agreed with the State that NFPA 921 is not newly-discovered evidence since it was in existence prior to the petitioner's trial. Moreover, noting that NFPA 921 has never been compulsory, the circuit court agreed with the State that its use in a new trial would be cumulative and constitute nothing more than impeachment evidence. Finally, the circuit court found that the criticisms set forth in the affidavits of the petitioner's new fire experts were not dissimilar to those offered by the petitioner's trial experts who testified that the State's investigative techniques and methods were flawed and their conclusions erroneous.

The petitioner appeals to this Court from the circuit court's December 24, 2014, order. *See* W.Va. Code § 53-4A-9 (2008) (providing for appeal to this Court from judgment under Post-Conviction Habeas Corpus Act).

24

## II. Standard of Review

Although several issues were raised below, in this appeal, the petitioner only assigns as error the circuit court's application of the rule governing newly discovered evidence, specifically as it relates to fire investigation science, and its denial of an evidentiary hearing. Our review of the circuit court's final order denying habeas corpus relief is threefold:

> In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006); *see also* Syl. Pt. 2, *State ex rel. Thompson v. Ballard*, 229 W.Va. 263, 728 S.E.2d 147 (2012) ("'Findings of fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside or reversed on appeal by this Court unless such findings are clearly wrong.' *State ex rel. Postelwaite v. Bechtold*, 158 W.Va. 479, 212 S.E.2d 69 (1975)."). Further, "[o]n an appeal to this Court the appellant bears the burden of showing that there was error in the proceedings below resulting in the judgment of which he complains, all presumptions being in favor of the correctness of the proceedings and judgment in and of the trial court." Syl. Pt. 2, *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 657 (1973). With these standards in mind, we proceed to determine whether the circuit court erred in denying habeas corpus relief to the petitioner.

## III.  Discussion

The petitioner sets forth two assignments of error.  First, he contends that his right to due process of law was violated because the habeas court failed to recognize, as newly-discovered evidence, the scientific advancement in fire investigation since his 1995 conviction.  According to the petitioner, this newly-discovered evidence is represented by NFPA 921, which reflects the standard of care in fire investigation and demonstrates that his trial and conviction were fundamentally unfair.  Second, the petitioner contends that the newly-discovered evidence is of a scientific and complicated nature such that the habeas court should have permitted him to develop the record through an omnibus habeas corpus hearing.

### A.  Newly-discovered Evidence

### 1.  The *Frazier* factors

In determining whether newly-discovered evidence warrants a new trial, this Court considers the following factors:

> "A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict.  (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point.  (4) The evidence must be such as ought to produce an opposite result at

26

a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side." Syllabus Point 1, *Halstead v. Horton*[,] 38 W.Va. 727, 18 S.E. 953 (1894).

Syllabus, *State v. Frazier*, 162 W.Va. 935, 253 S.E.2d 534 (1979); *accord* Syl. Pt. 1, *State v. O'Donnell*, 189 W.Va. 628, 433 S.E.2d 566 (1993); *see generally* W.Va. R. Crim. P. 33 (addressing motion for new trial based on newly-discovered evidence). All five factors must be proven before a new trial will be awarded.

We begin our analysis by observing that the petitioner has not cited any controlling appellate authority in this state to the effect that an expert opinion based on a methodology other than NFPA 921 is inadmissible as inherently unreliable. Nor does the petitioner assert that NFPA 921 has been generally accepted as authoritative or compulsory in West Virginia, either at the time of the petitioner's trial in 1995, or today. Although the National Fire Protection Association, or NFPA, generally, has been cited in statutory[40] and regulatory laws in this state,[41] we cannot find, nor do the parties cite, any statute or regulation

---

[40]*See* W.Va. Code § 29-3-5(b) (2013) (stating, in part, that "the State Fire Commission shall propose and promulgate comprehensive rules for the safeguarding of life and property from the hazards of fire and explosion to be known as the State Fire Code. . . . Whenever any new or revised code or standard is adopted by the fire codes published by the National Fire Protection Association, the State Fire Commission may propose and promulgate revised rules reflecting such updated codes and standards"); *Teller v. McCoy*, 162 W.Va. 367, 375, 253 S.E.2d 114, 120 (1978) (noting that State Fire Commissioner's regulations include National Fire Code published by the National Fire Protection Association).

[41]*See also* W.Va. C.S.R. § 87-1-2 (2014) (adopting NFPA 1 Fire Code (2012) which

(continued...)

where the State Fire Commission has expressly adopted NFPA 921 as either a compulsory or mandatory standard to be followed in fire investigations in this state.[42]  In fact, the statute

[41](...continued)
expressly states that its purpose is "to prescribe minimum requirements necessary to establish a reasonable level of fire and life safety and property protection from the hazards created by fire, explosion, and dangerous conditions" and which incorporates by reference other NFPA standards but not NFPA 921); W.Va. C.S.R. § 87-4-4 (2013) (adopting certain NFPA provisions with respect to the State Building Code); W.Va. C.S.R. §§ 87-8-1 to -8 (2015) (referencing NFPA provisions concerning training levels, curriculum approval, and equipment standards in relation to volunteer firefighters).

[42]We observe that some jurisdictions have recognized NFPA 921 as either an accepted reference or standard for fire investigators. *See, e.g., McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 653 (D. Kan. 2003) ("The 'gold standard' for fire investigations is codified in NFPA 921, and its testing methodologies are well known in the fire investigation community and familiar to the courts."); *Tunnell v. Ford Motor Co.*, 330 F.Supp.2d 707, 725 (W.D. Va. 2004) (noting that many courts have recognized NFPA 921 as peer reviewed and generally accepted standard).  However, even when courts recognize NFPA 921 as the standard for fire investigation, they often qualify that recognition.

For example, in *Fireman's Fund Insurance Co. v. Canon U.S.A., Inc.*, 394 F.3d 1054 (8th Cir. 2005), the Court of Appeals concluded that "[b]ecause the experts did not apply the principles and methods of NFPA 921 reliably to the facts of the case, the district court did not abuse its discretion in concluding that [the] . . . expert opinions were unreliable." *Id.* at 1060.  One year later, however, the same court upheld the admissibility of a fire expert's opinion testimony without reference to NFPA 921.  *See Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1257 (8th Cir. 2006) (addressing defendants' contention that plaintiff's fire cause and origin expert's opinions were unsupported by "reliable methodology" and concluding that expert's methodology was sound, noting his examination of burn patterns and heat, fire, and smoke damage, and his consideration and elimination of other possible causes of fire in area of origin).  Two years later, the Eighth Circuit rejected a litigant's attempt to rely upon *Fireman's Fund* for the proposition that "all expert testimony on fire causation must be supported by appropriate testing." *Shuck v. CNH America, LLC*, 498 F.3d 868, 875 n.3 (8th Cir. 2007).  As the Court of Appeals explained,

> *Fireman's Fund* does not stand for a bright line rule that expert opinions in fire cases always must be supported by testing to be admissible.  Rather, *Fireman's Fund* stands for the more general

(continued...)

28

pertaining to the State Fire Marshal's fire investigations does not mention NFPA 921. *See* W.Va. Code § 29-3-12(f) (stating, in part: "The State Fire Marshal may, at any time, investigate as to the origin or circumstances of any fire or explosion or attempt to cause fire or explosion occurring in the state.").[43] Although the petitioner's trial counsel relied upon NFPA 921 to criticize aspects of the investigations conducted by the State's fire investigators, the petitioner has failed to supply any authority that the State's cause and origin investigation had to follow the method outlined in the NFPA 921 to be admissible at the time of his trial. Moreover, even after the U.S. Department of Justice described NFPA 921 as having "become a benchmark for the training and expertise of everyone who purports to be an expert in the origin and cause determination of fires[,]"[44] NFPA 921 continues to be described in terms of

[42](...continued)
propositions that testing, if performed, must be appropriate in the circumstances and must actually prove what the experts claim it proves.

*Id.*

[43]The petitioner states in his brief that some state legislatures have passed resolutions stating that NFPA 921 is the standard of care in fire investigations. In that regard, whether NFPA 921 is adopted as the compulsory or mandated standard to be followed in fire investigations in West Virginia is a matter of fire policy that is best left to the State Fire Commission and/or the state legislature.

[44]*See Fire and Arson Scene Evidence: A Guide for Public Safety Personnel*, Research Report, U.S. Department of Justice, Office of Justice Programs, Technical Working Group on Fire/Arson Scene Investigation, p. 6 (June 2000), https://www.ncjrs.gov/pdffiles1/nij/181 584.pdf.

constituting "guidelines."[45]  In fact, NFPA 921 itself provides that its procedures are not compulsory, expressly stating in § 1.3 that "[d]eviations from these procedures, however, are not necessarily wrong or inferior but need to be justified."

When analyzed under the *Frazier* factors, it becomes abundantly clear that periodic amendments to NFPA 921 do not constitute newly-discovered evidence that would warrant a new trial in the case at bar.  *See also Green v. Koerner*, 312 F.App'x. 105, 110 (10th Cir. 2009) (affirming denial of habeas petition where petitioner cited developments in fire science since her conviction in 1995, and finding that state developed case based on best forensic techniques available at that time, "even if later scientific developments put those techniques into question").  In addition, we agree with the circuit court's conclusion that the affidavits of the petitioner's new fire experts– Gerald Hurst, a consulting chemist and expert on fire analysis, and Mark Goodson, an electrical engineer and expert in fire investigation and

_____

[45]*See Barr v. Farm Bureau Gen. Ins. Co.*, 806 N.W.2d 531, 533 (Mich. Ct. App. 2011) (addressing plaintiff's criticism of state fire marshal investigator's methodology as allegedly deviating from "set of guidelines" referred to as NFPA 921 and observing that "deviations from its procedures are not necessarily wrong, but need to be justified."); *Sanders v. Nationwide Mut. Ins. Co.*, No. 99954, 2014 WL 2565770, at *3 (Ohio Ct. App. June 5, 2014) (noting that fire expert, who was member of National Fire Protection Association, testified that "NFPA publishes *a recommended guideline called NFPA 921*") (emphasis added); *Stremke v. Fisher & Paykel Appliances, Inc.*, No. 71424-4-I, 2015 WL 5345399, *3 n.4 (Wash. Ct. App. Sept.14, 2015) (observing that defendant offered no authority for argument that NFPA 921 is "tantamount to a legally enforceable duty.").

causation–reflect they would merely offer cumulative evidence directed towards impeaching the State's fire experts, making the third and fifth *Frazier* factors unavailing.[46]

Mr. Hurst states in his affidavit that NFPA 921 is updated every three or four years and describes the fire investigation procedures that are to be followed in any fire investigation. He concludes the only scientifically supportable conclusion is that the cause and origin of the trailer fire remains "undetermined." Mr. Hurst also avers "to a reasonable degree of scientific certainty" that the State's fire investigation, under current NFPA 921 standards, "did not conform to recommended fire investigative protocol, was not conducted in a methodical and reliable fashion, and did not utilize the scientific method to determine origin and causation." Specifically, he determined that the State's hypothesis–that a fire originated with the toaster in the kitchen and in the victim's bedroom–was not scientifically valid and was the product of "expectation bias," rather than validation through the scientific method.[47]

---

[46]*Frazier*, 162 W.Va. at 935-36, 253 S.E.2d at 535, syl., in part (new evidence must not be merely cumulative, i.e., of same kind to same point, and new trial will generally be refused when sole object of new evidence is to discredit or impeach witness on opposite side).

[47]Assistant State Fire Marshal York testified that he was called to the fire scene the day of the fire to investigate because there was a possible fatality; that he did not know at that time whether the fire was accidental; and that the petitioner was not a suspect at that time.

Significantly, Mr. Hurst's criticisms, at their essence, echo those addressed by defense counsel during his cross-examination of the State's fire experts, as well as those voiced by the petitioner's experts at trial. For example, although Mr. Hurst contends the State's expert (Harold Franck) formed a hypothesis and then set out to prove its validity, Mr. Franck's trial testimony reflects that he took possession of the toaster for a closer examination in his lab because it was the sole potential cause of the fire in what he had determined to be the area of fire origin. Mr. Franck also examined the electrical outlet into which the toaster had been plugged to determine whether it was involved in causing the fire. The fact that the results of his analyses pointed to an incendiary fire does not indicate that he set out to prove arson.

Mr. Hurst also criticizes the State's investigators' conclusion that there was a second incendiary fire, as well as their failure to seize the purportedly discolored linoleum surrounding the vent in the victim's bedroom,[48] and the failure to consider the possibility that the charred debrís recovered from the purported second fire could have been carried into the room during fire suppression and investigation. He further criticizes their reliance on "V" burn patterns in the trailer;[49] their photographing the circuit breaker to the smoke detector in

---

[48]Although the State's investigators did not seize the linoleum, they did photograph it as it was found.

[49]While Mr. Hurst states that Mr. Franck's use of the "V" pattern near the toaster to conclude that the fire origin was at the toaster is contrary to empirical studies, Mr. Franck's

(continued...)

32

the "off" position without recognizing that the breaker had been turned to that position after the fire; and their failure to consider locations other than the kitchen counter top as possible points of origin. Mr. Hurst was also critical of Mr. Franck's analysis regarding a "saddle mark" on a section of the toaster cord, the beading on the toaster wire, and his reliance on the "patterns" inside the toaster as a basis to conclude that the cord had been stuffed inside the toaster. Again, as discussed above, each of these areas of criticism was fully explored either in defense counsel's vigorous cross-examination of the State's experts, or through the trial testimony of the petitioner's fire experts, or both.[50]

The petitioner's other new expert is equally critical of the State's investigation. In his affidavit, Mark Goodson describes how NFPA 921 incorporates the scientific method into the field of fire investigation and has become the standard for assessing the reliability of expert testimony.[51] Following his review of those portions of the trial transcript and exhibits

---

[49](...continued)
trial testimony reveals that the "V" pattern was but one factor that he considered. As Lieutenant Begley testified, a "V" pattern, while not conclusive, is one indicator of a fire's point of origin.

[50]The circuit court noted in its habeas order that the petitioner's defense team was comprised of two "smart, aggressive, well-known and well-respected lawyers," one of whom previously served as a justice of this Court and is currently a sitting circuit court judge in West Virginia.

[51]Mr. Goodson sets forth in his affidavit the six steps in NFPA 921 for fire investigation. In summary, those steps are directed to: (1) recognizing that a fire or explosion has occurred; (2) defining the problem by examining the scene and reviewing previously

(continued...)

33

specifically related to the fire, Mr. Goodson concludes that the State's cause and origin witnesses did not follow the scientific method in connection with their investigation of the trailer fire, and they used methods that are not currently accepted within the fire investigation community today. He found Mr. Franck's analyses and opinions to be so flawed as to compel improper conclusions, particularly with regard to Mr. Franck's analysis of the toaster and its cord. These criticisms are not unlike those expressed by the petitioner's trial expert, Charles Kovarik, as discussed above. Further, although Mr. Goodson states that Mr. Franck should have microscopically documented the contact between the toaster cord and the heating element, the record shows that during Mr. Franck's trial testimony, he specifically references his "microscopic examination of these wires[.]" Mr. Goodson also cites Mr. Franck's failure to consider that Lieutenant Begley found the circuit breaker connected to the smoke detector was tripped and moved it to the "off" position. Again, this criticism was developed during the cross-examination of Mr. Franck and the other witnesses for the State, and in the direct testimony of the petitioner's fire experts.[52]

---

[51](...continued)
conducted investigations of the incident, interviewing of witnesses, etc.; (3) collecting data based on observation or experience; (4) analyzing the data in the light of the investigator's knowledge, training, and experience; (5) developing a hypothesis based on the data analysis of the data collected; and (6) testing the hypothesis by eliminating all other reasonable origins and causes and comparing hypothesis to all known facts. Even if we were to assume that the fire experts who investigated the subject fire were required to follow NFPA 921, we cannot say that their respective investigations, at their essence, drastically deviated from these six steps.

[52]Mr. Goodson also criticizes Mr. Franck's testimony regarding the smoke detector,
(continued...)

34

Based on all of the foregoing, it is clear that the attack advanced by the petitioner's current experts, while framed as deviations from NFPA 921 and "scientific" methodology, is, at is essence, simply rebuttal and impeachment evidence.[53] Furthermore, the evidence the petitioner seeks to rely upon is cumulative of the petitioner's trial experts who thoroughly criticized the State's investigation as being faulty and inaccurate. As the circuit court correctly observed:

> [o]f great importance and significance is the fact that indeed two (2) expert witnesses did testify at trial on behalf of the Petitioner. Both of said expert witnesses were unequivocally and clearly critical and contradictory of the State's expert witnesses, and both of the defense trial experts testified that the fire in the trailer was accidental in origin and that it was not started intentionally. The Petitioner's new expert witnesses may have had the benefit of approximately twenty (20) years of advancement in fire science, but the bedrock of their proposed testimony would certainly be the same as was the testimony of the Petitioner's two (2) experts who testified at trial, i.e. that the State's experts' investigative techniques and methods were flawed, and their conclusions wrong.

---

[52](...continued)
noting that Mr. Franck thought it was "probably a carbon monoxide detector," when it was not. Mr. Goodson fails to mention, however, that Mr. Franck later testified during cross-examination he was not saying that it was a carbon monoxide detector.

[53]Under the fifth *Frazier* factor, while new impeachment evidence will not normally mandate a new trial, we have also stated that a new trial should be granted where the first four factors are met and the new impeachment evidence concerns the key prosecution witness. *State v. Stewart*, 161 W.Va. 127, 136, 239 S.E.2d 777, 783 (1977). Because we find that the other *Frazier* factors are not met here, a new trial not required.

The opinions of Mr. Franck and Mr. York were the result of a reliable process. Both collected data; took photographs; noted the extent of damage in the various areas of the trailer; and eliminated potential accidental causes for the fire by examining appliances and electrical circuitry and outlets. Mr. Franck took the toaster and other materials to his lab where they were subjected to further examination. Accordingly, we agree with the circuit court's conclusion that NFPA 921, the advancement of scientific method in the field of fire investigations, and the criticism expressed by the petitioner's new experts goes to the weight to be attributed to the testimony of Mr. Franck and Mr. York–not to its admissibility at trial. *See Schlesinger v. United States*, 898 F.Supp.2d 489, 504-05 (E.D. N.Y. 2012) (observing that "no court in this circuit . . . has refused to admit expert testimony in an arson case because his or her opinion was based on a methodology other than that prescribed in NFPA 921"; finding that fire investigator's conclusion that fire was incendiary was based on his years of experience and his physical inspection of fire premises; and concluding that "[t]he decision not to follow the methodology set forth in NFPA 921, as well as other purported flaws in the [investigator's] [] methodology . . . goes to the weight of the evidence, not its admissibility."). Indeed, once all of the expert testimony was received into evidence, "it was left to the jury to evaluate that testimony and give it the weight to which it was entitled." *State v. Shingleton*, No. 12-1445, __ W.Va. __, __ S.E.2d __, at *10 (Mar. 24, 2016) (citation omitted); *see also People v. Jackson*, No. 272776, 2008 WL 2037805, at *1 (Ct. App. Mich. May 13, 2008) (addressing defendant's challenge to opinions of state's fire expert based on NFPA 921 and concluding

36

that deviations from those procedures are not necessarily wrong or inferior and did not render expert's opinion inadmissible since "[s]uch criticisms go to the weight rather than the admissibility of the testimony.").

The fourth *Frazier* factor is perhaps most problematic for the petitioner—that his purported newly-discovered evidence ought to produce an opposite result at a second trial on the merits. Although we have found no legal authority demonstrating that NFPA 921 is either a compulsory or mandated standard for fire investigations in this state, the fact remains that the criticisms being offered by the petitioner's new experts are not new and their conclusions are less favorable than those offered by the petitioner's trial experts, who were confident in their respective opinions that there was a single, *accidental* fire. In other words, if the jury reached its unanimous verdict[54] based on the substantial circumstantial evidence presented against the petitioner, coupled with the State's expert testimony that was subjected to thorough cross-examination, we cannot find that similar criticisms offered by the petitioner's

---

[54]Following an eleven-day trial, the jury returned its verdict in less than three hours, finding the defendant guilty of first degree murder without a recommendation of mercy.

new fire experts are likely to produce an opposite result at a second trial.[55]  As the circuit court

aptly summarized:

> The Court, having presided over the Petitioner's eleven (11) day jury trial and having reviewed the transcript thereof, finds that there was, beyond any doubt, overwhelming evidence clearly supporting the jury's unanimous guilty verdict.  The Petitioner was the only person, other than the victim, who lived in the trailer and was in the trailer the night of the fire; the State's physical evidence concerning the conditions of the aforementioned electric bread toaster following the fire was and clearly would be suspicious to any reasonable person without any further interpretation or opinion by any expert witness; the Petitioner's use of weather stripping to seal the area around his bedroom door, despite his very weak argument that securing towels and other materials with weather stripping around his bedroom door was to suppress or prevent noise made by the Petitioner from disturbing the victim in her bedroom, would clearly be considered, by any reasonable person, to be highly suspicious conduct and circumstances; the Petitioner's gaining sole control of the victim's CDs, totaling in excess of found [sic] hundred thousand dollars ($400,000.00) following her death; and the victim's revocation of the aforementioned power of attorney within six (6) days and victim's desire to disinherit the Petitioner, expressed to Mr. Tissue

---

[55]In *State v. Davis*, 217 W.Va. 93, 616 S.E.2d 89 (2004), the petitioner asserted that she should have been granted a second trial based on new genetic testing that had been performed on her son.  We concluded that

> [a]lthough it may be argued that the genetic test allegedly proving that Seth had the condition was not available at trial, in this Court's view, the results of the test were merely cumulative of what was presented at trial. . . .  Overall, the evidence was not such "as ought to produce a second trial on the merits," and consequently, it cannot be said that the circuit court abused its discretion in denying a new trial on the new genetic test results.

*Id.* at 100, 616 S.E.2d at 96.

a mere six (6) days prior to the fatal fire, which clearly is strong direct and circumstantial evidence, strongly supports the jury's unanimous guilty verdict, which was reached after two (2) hours and forty-nine (49) minutes of deliberations.

Having considered this evidence, as well as the evidence given by neighbors and longtime friends who testified the victim told them the petitioner was verbally and physically abusive towards her and that all he wanted was her money,[56] we concur in the circuit court's inescapable conclusion that

the expert testimony which the Petitioner now seeks to use as "newly discovered evidence" is clearly not "such as ought to produce an opposite result at a second trial on the merits" as required by Frazier. The Court concludes, having heard all the evidence at trial, that had the Petitioners "new" experts testified at trial, the jury's verdict would have been the same.

Accordingly, we uphold the circuit court's denial of habeas relief on the basis that the petitioner cannot meet the *Frazier* factors for newly discovered evidence.

---

[56]At first blush, *Bunch v. State*, 964 N.E.2d 274 (Ct. App. Ind. 2012), seemingly supports the petitioner's argument herein. In *Bunch*, the petitioner appealed the denial of her habeas petition wherein she sought to overturn her felony murder conviction based on newly-discovered evidence. The appellate court reversed, determining that advances in the field of fire victim toxicology analysis constituted newly-discovered evidence that warranted a new trial. However, in reaching its decision, the court repeatedly noted that the prosecution had offered no motive evidence for Bunch to have intentionally set the fire that killed her son. In clear contrast to *Bunch*, here, the State presented a tremendous amount of motive evidence against the petitioner, including testimony that the petitioner was abusive of the victim and repeatedly sought money from her, and that the victim planned to disinherit the petitioner of hundreds of thousands of dollars.

## 2. Due Process Violation and
## Inadmissibility of Expert Testimony

In further support of his newly discovered evidence argument, the petitioner also asserts that his due process rights were violated because the investigative techniques used during the investigation of the subject fire would not be admissible at trial today, under a *Daubert*/*Wilt* analysis, since fire investigations have become "scientific." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993). In *Wilt* and *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995), we adopted a *Daubert* analysis which imposes a "gatekeeper" duty upon trial courts to screen scientific expert opinions to ensure relevancy and reliability.

We first note that the petitioner's argument on appeal is somewhat different from the argument he raised before the circuit court, which was ineffective assistance of trial counsel for their failure to raise a *Daubert* challenge to the State's experts' testimony at trial. The circuit court disagreed, finding that *Daubert* "does not and did not apply to the State's expert witnesses." As the State points out, if the methods employed by the State's experts were non-scientific, as the petitioner asserts, then *Daubert/Wilt* does not apply. *See Watson v. Inco Alloys Intern., Inc.*, 209 W.Va. 234, 545 S.E.2d 294 (2001) (finding expert engineer's opinion testimony was technical, not scientific, thus *Daubert/Gentry* gatekeeper analysis did not apply).

40

Even today, the admissibility of the State's expert testimony would be assessed under Rule 702 of the West Virginia Rules of Evidence[57] as evidence based on technical or specialized knowledge—and not under *Daubert/Wilt*.[58]  *See, e.g.*, *State v. McCracken*, 218

---

[57]Rule 702 (2014) provides:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
>
> (b) In addition to the requirements in subsection (a), expert testimony based on a novel scientific theory, principle, methodology, or procedure is admissible only if:
>
> (1) the testimony is based on sufficient facts or data;
>
> (2) the testimony is the product of reliable principles and methods; and
>
> (3) the expert has reliably applied the principles and methods to the facts of the case.

[58]In this regard, we decline the petitioner's invitation to adopt *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999), wherein the Supreme Court "ultimately concluded that the gatekeeper function of *Daubert* also applied to expert testimony based on technical or other specialized knowledge." *Watson*, 209 W.Va. at 241 n.11, 545 S.E.2d at 301 n.11. Further, even if the methodology employed by the fire investigators in 1994 had been scientific, rather than technical, the petitioner does not cite any decision of this Court where we have applied *Daubert/Gentry* retroactively in a habeas proceeding.  Indeed, an alleged error in the admission of scientific evidence that did not meet the *Daubert* standard is not cognizable in a habeas corpus proceeding. *See State ex rel. Thompson v. Ballard*, 229 W.Va. 263, 728 S.E.2d 147 (2012) (affirming denial of habeas relief and noting that alleged error in admission of scientific evidence that did not meet *Daubert* standard was not cognizable in habeas corpus where such rulings did not rise to constitutional level); Syl. Pt. 4, *State ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979) ("A habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed."); *see also Romano v. State*, 909 P.2d 92, 112 (Okla. Crim. App. 1995) ("[W]e will not apply the *Daubert* analysis retroactively to scientific subjects previously accepted as valid for expert testimony.").

41

W.Va. 190, 624 S.E.2d 537 (2005) (finding no abuse of discretion in trial court's admission of testimony of fire investigator under Rule 702, noting that expert was firefighter for more than forty years, was retired lead fire investigator, and served as consultant in fire and arson investigations, and observing that defense had opportunity to cross-examine witness regarding any issues raised).

Given the absence of any authority demonstrating that NFPA 921 is a compulsory or mandatory standard for fire investigators in West Virginia, either today, or in 1995, we find that the petitioner was not denied his right to a fair trial and due process of law through the admission of the testimony of the State's experts. *See Jackson v. McQuiggin*, No. 10-12426, 2012 WL 5410993, at *6 (E.D. Mich. Nov. 6, 2012), *aff'd*, *Jackson v. McQuiggin*, 553 F.App'x. 575 (6th Cir. 2014) (finding habeas petitioner's state court trial was not fundamentally unfair nor were his due process rights violated by trial court's decision to admit testimony of state's fire expert, citing with approval state appellate court's conclusion that "NFPA 921 expressly provides that it contains only nonmandatory provisions; it merely sets guidelines and recommendations for fire investigations, not requirements."). For these reasons, we find no abuse of discretion in the circuit court's habeas ruling.

## B.  Denial of Evidentiary Habeas Hearing

The petitioner argues that the circuit court abused its discretion in denying his request for an evidentiary hearing because it has prevented him from demonstrating the substantial impact of the new fire investigation science on the expert testimony presented at his trial.  The State asserts that the circuit court did take evidence on the petitioner's newly discovered evidence through the affidavits of his new experts, and contends that the petitioner has failed to explain what additional evidence the circuit court needed to address his claim.

As provided in West Virginia Code § 53-4A-7(a) (2008), the decision to hold an evidentiary hearing is at the discretion of the circuit court:

> If the petition, affidavits, exhibits, records and other documentary evidence attached thereto, or the return or other pleadings, or the record in the proceedings which resulted in the conviction and sentence . . . show to the satisfaction of the court that the petitioner is entitled to no relief, or that the contention or contentions and grounds (in fact or law) advanced have been previously and finally adjudicated or waived, the court shall enter an order denying the relief sought.

Further, we have previously held that

> "[a] court having jurisdiction over habeas corpus proceedings may deny a petition for a writ of habeas corpus without a hearing and without appointing counsel for the petitioner if the petition, exhibits, affidavits or other documentary evidence filed therewith show to such court's satisfaction that the petitioner is entitled to no relief." Syllabus Point 1, *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 657 (1973).

Syl. Pt. 2, *White v. Haines*, 215 W.Va. 698, 601 S.E.2d 18 (2004).

43

The circuit court judge was in the unique position of having also presided over the petitioner's eleven-day murder trial. Consequently, he was intimately familiar with the trial evidence[59] when assessing the affidavits of the petitioner's new experts, which he found had "thoroughly set forth the nature of the claimed advancements in scientific fire investigation which constitutes the crux of the Petitioner's argument," and which led to the court's conclusion that "no testimony or other evidence [was] [] necessary for the Court to rule upon the application of the relevant law[.]" The circuit court's decision in this regard is adequately supported by its thirty-six-page order that recounts the evidence from the petitioner's criminal trial, as well as its "careful review" of the parties' briefs and the new expert affidavits, which led it to conclude that "the relevant facts of the case . . . have been sufficiently and adequately developed" for the court to rule as a matter of law. The circuit court's factual findings and legal conclusions are certainly sufficient to meet Rule 9(a) of the Rules Governing Post-Conviction Habeas Corpus Proceedings in West Virginia, which provides that "[i]f the court determines that an evidentiary hearing is not required, the court shall include in its final order specific findings of fact and conclusions of law as to why an evidentiary hearing was not required."

[59]The circuit court expressly stated in its order that it had engaged in a "full, careful, [and] thorough consideration and review" of the "complete contents of the court file in the Petitioner's underlying criminal case[,]" as well as the complete habeas file.

44

Based on our review of the trial and habeas proceedings, and for the reasons set forth above, we agree that the nature of the claimed advancements in scientific fire investigation were sufficiently addressed in the parties' briefs and expert affidavits filed below, and we find no abuse of discretion in the circuit court's decision to rule without first holding an evidentiary hearing.

## IV.  Conclusion

For the foregoing reasons, we find no reversible error in the circuit court's December 24, 2014, order denying the petitioner's request for habeas corpus relief.

Affirmed.